UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

UNIVERSITY AT BUFFALO YOUNG
AMERICANS FOR FREEDOM, et al.,

                Plaintiffs,

      v.

UNIVERSITY AT BUFFALO STUDENT
ASSOCIATION INC., et al.,

                Defendants.

───────────────────────────────

                              23-CV-480-LJV
                              DECISION & ORDER

On June 1, 2023, University at Buffalo Young Americans for Freedom ("UB

Young Americans for Freedom") and several of its members commenced this action

against the University at Buffalo Student Association Inc. (the "Student Association")

and three State University of New York at Buffalo ("UB") officials.[1]  Docket Item 1

(complaint).  The plaintiffs generally alleged that the defendants violated their rights

under the First Amendment, id., and they have since amended their complaint twice,

see Docket Items 21 and 37.

On January 2, 2024, three defendants—UB Vice President for Student Life Brian

Hamluk, UB Director of Student Engagement Phyllis Floro, and UB Dean of Students

Tomás Aguirre[2] (the "UB administrators")—moved to dismiss the second amended

───────────────────

[1] This case originally was commenced by UB Young Americans for Freedom and
three of its members: Justin Hill, Amelia Slusarz, and Jacob Cassidy.  See Docket Item
1.  But on June 20, 2024, Cassidy moved to voluntarily dismiss his claims against all
defendants, and this Court dismissed him from the case.  See Docket Items 57 and 58.
So only two individual plaintiffs remain.

[2] The plaintiffs sued the UB officials only in their official capacities.  Docket Item 1
at 1; id. at ¶¶ 29, 32, 34; Docket Item 21 at 1; id. at ¶¶ 35, 38, 40; Docket Item 37 at 1;

complaint, Docket Item 40; a day later, the Student Association did the same, Docket Item 41. After the parties briefed those motions, Docket Items 42, 43, 44, and 45, the plaintiffs moved for a preliminary injunction prohibiting the defendants from enforcing one of the policies at issue, Docket Item 46. The parties then briefed that motion, Docket Items 51, 52, and 53, and this Court heard oral argument on the three pending motions, Docket Item 56.

For the reasons that follow, this Court grants the defendants' motions to dismiss the second amended complaint for lack of subject matter jurisdiction and failure to state a claim on which relief can be granted, and it therefore denies the plaintiffs' motion for a preliminary injunction.

## BACKGROUND[3]

UB Young Americans for Freedom is "a chapter of the national non-profit organization, Young America's Foundation." Docket Item 37 at ¶ 24. The group's

---

*id.* at ¶ 43. Elizabeth Lidano was named in the first two complaints in her official capacity as Interim Dean of Students, Docket 1 at 1; *id.* at ¶¶ 30, 32; Docket Item 21 at 1; *id.* at ¶¶ 36, 38, but Aguirre was substituted for Lidano in the second amended complaint because he had replaced her as Dean of Students, *see* Docket Item 37 at ¶ 39.

[3] The following facts are taken from the second amended complaint and its attached exhibits. *See* Docket Item 37, 37-1, 37-2, 37-3, 37-4, 37-5, 37-6, 37-7, 37-8, 37-9, 37-10, 37-11, and 37-12. On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010). But on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016); *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

purpose is to provide an environment for the students of UB to learn about United States history, the United States Constitution, individual freedom, a strong national defense, free enterprise, and traditional American values through student activities, on-campus lectures by local and national speakers, and service efforts for local military [sic] and veterans.

*Id.* at ¶ 25.  The group "fulfills [that] purpose primarily by being an expressive organization" that "engages in a wide variety of expressive activities, including posting flyers and signs, hosting tables with information, inviting speakers to campus, and talking with fellow students."  *Id.* at ¶ 26.  The two individual plaintiffs in this action— Justin Hill and Amelia Slusarz—are UB students and members of UB Young Americans for Freedom.  *Id.* at ¶¶ 29-30, 32.

Under UB's "Student Club and Organization University Wide-Recognition Policy" (the "UB Recognition Policy"), student organizations must be recognized by "a '[UB] [r]ecognizing [a]gent' to become a recognized student organization and access the benefits granted to such organizations."  *Id.* at ¶ 61 (citation omitted); Docket Item 37-1 (UB Recognition Policy).  The Student Association, a UB student government body and recognizing agent, "publishes and enforces additional club recognition policies" with requirements for a UB student group to be recognized by the Student Association. Docket Item 37 at ¶ 70; *see* Docket Item 37-1 at 4.[4]  "Although [UB] departments and other entities can act as . . . [u]niversity [r]ecognizing [a]gent[s], only student organizations that are recognized by the . . . Student Association are eligible to access the mandatory student activity fee[]" that is "collected by [UB] from all undergraduate students" and "distributed to student organizations by the . . . Student Association." Docket Item 37 at ¶¶ 37, 64.

---

[4] Page numbers in docket citations refer to ECF pagination.

From 2017 until 2023, the Student Association recognized UB Young Americans for Freedom as a student organization, apparently without incident. *Id.* at ¶¶ 24, 71, 72; *see generally id.* But things became contentious, the plaintiffs say, during the spring semester of 2023: In March of that year, "UB Young Americans for Freedom hosted cultural commentator Michael Knowles, who lectured on campus about cultural responses to gender ideology." *Id.* at ¶ 73. That event "garnered much attention and some protests on campus." *Id.* at ¶ 74. And according to the plaintiffs, it triggered changes in policy that resulted in this lawsuit. *See id.* at ¶¶ 71-77.

More specifically, on March 27, 2023, "approximately two weeks after . . . Knowles'[s] lecture," the Student Association "revised [its] policies . . . govern[ing] club recognition" by adopting a "New Club Recognition Policy." *Id.* at ¶¶ 75, 78; Docket Item 37-3 (New Club Recognition Policy). The new policy provided that "[e]xcept for clubs in the Academic, Engineering, or Sports Councils, and clubs whose sole purpose is to engage in inter-collegiate competition, no [Student Association] club may be a chapter of or otherwise part of any outside organization."[5] *Id.* at ¶ 78; Docket Item 37-3 at 2. The plaintiffs call that provision the "National Affiliation Ban." *See, e.g.*, Docket Item 37 at ¶¶ 75-76. When the National Affiliation Ban was passed, the Student Association president said that "[w]e all know why we're doing this," which the plaintiffs say shows that the new policy was intended to "target [them] and their views." *Id.* at ¶ 77.

The Student Association subsequently passed another resolution ("Resolution No. 32") stating that "all existing [Student Association]-recognized clubs shall have until

---

[5] The New Club Recognition Policy included additional requirements not at issue here. *See* Docket Item 37-3.

May 31, 2023[,] to come into compliance with [the National Affiliation Ban] and that any club's failure to do so will result in the automatic derecognition of that club." Docket Item 37-4 (text of Resolution No. 32); *see* Docket Item 37 at ¶ 82. "Thus," the plaintiffs say, on June 1, 2023, "the Student Association automatically derecognized UB Young Americans for Freedom because it remain[ed] a chapter of Young America's Foundation." Docket Item 37 at ¶ 86.

"Due to that automatic derecognition," the group "could no longer receive any of the benefits afforded to recognized student organizations"; "was no longer eligible to receive the budget it was allocated from the mandatory student activity fee"; and "could not effectively communicate its messages on campus." *Id.* at ¶¶ 87-88. In addition, the group "could not reserve table space in the Student Union, could not reserve classroom space for its weekly meetings, and could not reserve meeting space for guest speakers." *Id.* at ¶ 89.

On June 1, 2023—the same day that UB Young Americans for Freedom was automatically derecognized—the plaintiffs commenced this action against the Student Association and the UB administrators, alleging that the National Affiliation Ban violated their First Amendment rights. *See* Docket Item 1. A few weeks later, the plaintiffs moved for a preliminary injunction prohibiting the defendants "from enforcing [their] student organization recognition policies to the extent they require derecognition . . . of UB Young Americans for Freedom because of its affiliation with a national organization—Young America's Foundation." Docket Item 15.

A short time after that, on July 3, 2023, the Student Association's Executive Committee passed two resolutions. *See* Docket Item 37 at ¶ 101; Docket Item 37-5

(text of resolutions).  The first of those resolutions "extend[ed the] deadline" for

"[Student Association]-recognized clubs" to comply with the requirements of the

National Affiliation Ban.  Docket Item 37-5 at 4.  The second resolution—Executive

Committee Resolution 2022-2023, No. 7 ("Resolution No. 7")—set forth the history and

purported purpose of the National Affiliation Ban.  *Id.* at 6.  More specifically, Resolution

No. 7 stated that

> it is in the best interest of [the Student Association], [UB] undergraduate students, and members of all [Student Association] clubs to ensure awareness of and compliance with [the rules and policies of the State University of New York ("SUNY"), UB, and the Student Association]; and [that]
>
> . . .
>
> when a [Student Association] club is a chapter of or otherwise a part of an outside organization whose rules or policies conflict with or differ from those of SUNY, UB, and/or [the Student Association], it can cause a lack of compliance with SUNY's, UB's, and/or [the Student Association's] rules and policies; and [that]
>
> the leaders and members of some [Student Association] clubs that are a chapter of or otherwise a part of an outside organization may not be aware of such conflicts or differences between the rules and policies of the outside organization and those of SUNY, UB, and/or [the Student Association], or they may attempt not to comply with the SUNY, UB, or [Student Association] rules or policies [or face pressure not to comply].

*Id.* at 5-6.

        To address that issue, Resolution No. 7 continued, the Student Association had

passed the National Affiliation Ban, but it then "heard [and considered] student

feedback" about the new policy.  *Id.* at 6.  Based on that feedback, the Student

Association "ultimately never implemented" the provision.  *Id.*  And it "now desire[d] to

attempt to address an underlying concern reflected in th[at p]olicy but in a different

manner."  *Id.*

Resolution No. 7 then "repealed" the National Affiliation Ban, "deemed [it] to never have taken effect, as [that provision and Resolution No. 32] were never implemented," and replaced it "with a different requirement."  *Id.* at 6-7.  More specifically, Resolution No. 7 required that beginning on September 11, 2023,

> prior to taking any act as a [Student Association] club officer—including but not limited to the use of [Student Association] club funds, facilities, or other resources—a student officer of a [Student Association] club must sign [a] document, entitled "Acknowledgment of Club Officer Responsibilities."

*Id.* (the "Acknowledgment Provision"); Docket Item 37 at ¶ 105-06.

The Acknowledgment Provision requires all club officers to certify their compliance with preexisting requirements governing the operation of all student groups recognized by the Student Association.  Docket Item 37-5; *see* Docket Item 37 at ¶¶ 107-09.  Those requirements were and are codified in section 7.04(d) of the Student Association's By-Laws, Docket Item 37-6 at 23-24, which the plaintiffs refer to as the "Legal Status Ban," Docket Item 37 at ¶ 107.  Under the Legal Status Ban,

> [n]o club shall be a separate legal entity from [the Student Association]. Recognized clubs may not have any accounts or financial activities outside . . . [the Student Association].  Recognized clubs may not enter into contracts, take legal actions, commence litigation or undertake legal obligations; only [the Student Association] itself may enter into contracts, take legal actions, commence litigation and/or undertake legal obligations.

Docket Item 37-6 at 23-24; *see* Docket Item 37 at ¶¶ 107, 109.

Following the repeal of the National Affiliation Ban, the plaintiffs withdrew their first motion for a preliminary injunction, Docket Items 19 and 20, but not their claims in this case; instead, they filed an amended complaint and then a second amended complaint, Docket Items 21 and 37.  In those amended pleadings, the plaintiffs allege that the repeal did not change anything because the Acknowledgment Provision imposed a "different requirement" that "accomplished the same objective as the

National Affiliation Ban" in a different way—that is, through a "reinvigorated enforcement of the Legal Status Ban." *See, e.g.*, Docket Item 37 at ¶ 108 (internal quotation marks omitted). By combining the Acknowledgment Provision and the Legal Status Ban, the plaintiffs say, "the Student Association forces student groups to choose between being recognized on campus as a student organization and retaining their legal existence, separate identity as an entity, and even their civil rights." *Id.* at ¶ 10.

Under the Acknowledgment Provision, "[t]o gain status as a recognized student organization and to conduct any action as officers, [the p]laintiffs must sign" the required form "certify[ing] that they are complying with the Legal Status Ban." *Id.* at ¶ 129. "Failure to sign [also] exposes [the p]laintiffs to penalties that include derecognition." *Id.* at ¶ 134. But the plaintiffs have not signed the form. *Id.* at ¶¶ 131-35. In fact, they say that they "cannot" sign the form because the Legal Status Ban bars UB Young Americans for Freedom from commencing litigation, and the group is currently litigating this very lawsuit to "vindicate [its] constitutional rights."[6] *Id.* at ¶¶ 129-31.

What is more, the Student Association will not let the plaintiffs sign a form with additional "language . . . that would allow them to sign it without certifying as true something . . . false." *Id.* at ¶ 132. "Because [the Student Association] rejected the forms [that the p]laintiffs submitted, [the plaintiffs] cannot access the funds allocated to UB Young Americans for Freedom as of October 5, 2023[,] and have been unable to do so since the beginning of the 2023-2024 academic year." *Id.* at ¶ 135. And "[b]ecause

---

[6] The Student Association "maintains that UB Y[oung Americans for Freedom] . . . lacks capacity to sue" the Student Association under the Legal Status Ban. Docket Item 41-8 at 25 n.7. Nonetheless, while the Student Association "does not waive" that defense, it notes that "the issue is largely academic" because "the individual [p]laintiffs [clearly] have capacity to sue." *Id.*

[they] lack access to th[o]se funds, they have been unable to use UB Young Americans for Freedom's funds to purchase food for meetings, banners for tabling events, and spray paint for other expressive activities." *Id.* at ¶ 137.

Further, because the Legal Status Ban bars them from taking certain actions unilaterally, the plaintiffs are forced to seek permission from the Student Association to take various actions under several Student Association policies. *See id.* at ¶¶ 138-180. Those policies give the Student Association "unbridled discretion" to "deny" or "delay" a club from taking certain "acts essential to" its ability to express itself—entering into contracts, engaging in financial transactions, raising funds, or holding property—"for any reason." *Id.* at ¶¶ 138-180, 248, 266.

For example, "[to] enter into an agreement to host a speaking event (or any other event), UB Young Americans for Freedom officers must submit proposed contracts to the Student Association," which "has discretion to sign, not sign, modify, or delay the contract or agreement," even if it prevents an event from occurring. *Id.* at ¶ 152. This rule applies to "agreements of any nature and promises of any kind," but the Student Association's policies, including its "Contracts Policy," do "not contain any criteria, let alone a comprehensive list of objective criteria," for the approval of a contract. *Id.* at ¶¶ 111-13, 151-52; *see id.* at ¶ 159 ("Notably absent [from the Student Association's Contracts Policy] are any comprehensive and viewpoint[-]neutral guidelines for approval, an appeal process, recording process, or guarantee of timeline."); Docket Item 37-8 (Contracts Policy). In fact, the Student Association took "almost two months" to approve the contract for the event with Michael Knowles, ultimately signing the contract just "three days before the event was scheduled to take place" and thereby "creat[ing]

substantial logistical difficulties and burdens [in] planning the event."[7]  *See* Docket Item 37 at ¶¶ 160-173.  So, the plaintiffs say, the Student Association has unlimited authority to permit the speakers it likes and prohibit the speakers it dislikes.  *Id.* at ¶ 152.

The same is true with respect to spending money:  The Student Association "must approve all financial transactions for UB Young Americans for Freedom," but "[t]here are no written criteria" limiting the Student Association's discretion "to approve or not . . . approve a financial transaction."  *Id.* at ¶¶ 153-54.  Likewise, under the Student Association's "Safeguarding Cash and Cash Equivalents Policy," student groups must "obtain[] the permission of the Student Association and other [UB] offices" before "rais[ing] funds"; "[e]ven such traditional fundraising activities as . . . weekend car wash[es] are prohibited."  *Id.* at ¶¶ 144-46; *see* Docket Items 37-9 (Fundraising, Revenue, and Rollover Policy); Docket Item 37-10 (Safeguarding Cash and Cash Equivalents Policy).  So UB Young Americans for Freedom cannot spend or raise money without the approval of the Student Association.

---

[7] UB Young Americans for Freedom's president initially "submitted a contract to the Student Association for review on January 12, 2023," Docket Item 37 at ¶ 163, but the Student Association did not respond until several weeks later, *see id.* at ¶¶ 163-66.  More specifically, on February 6, 2023, a Student Association vice president responded to an in-person inquiry from UB Young Americans for Freedom's president by stating that UB Young Americans for Freedom "had violated the Student Association's policy by signing the speaker agreement before submitting it to the Student Association" and that UB Young Americans for Freedom would have "to use a generic 'artist contract' form the Student Association had used previously."  *Id.* at ¶¶ 165-67.  On February 14, 2023, UB Young Americans for Freedom "submitted the [Student Association's] model artist contract to the [Student Association] for approval without any substantive changes," but the Student Association "refused to approve or sign [the agreement] until March 6, 2023."  *Id.* at ¶ 169.  According to the online website for Student Association contract approval, the approval "process generally takes [two to three] weeks depending on various situational factors."  Docket Item 37-11 at 2.  So the Student Association can thwart, and has in fact burdened, activities through delay.  *See* Docket Item 37 at ¶¶ 160, 172.

Finally, UB Young Americans for Freedom "cannot own[] any property under its own name" because under the "Capital Equipment and Disposal Policy," any "property purchased with . . . [Student Association] . . . funds is the property of [the Student Association] . . . on discretionary loan for the use of the club."  Docket Item 37 at ¶¶ 174-75; Docket Item 37-12 (Capital Equipment and Disposal Policy).  Moreover, "[t]he [Student Association t]reasurer may direct any equipment or supplies to be reclaimed by [the Student Association] if the club . . . fails to utilize equipment or supplies in a proper and justifiable manner."  Docket Item 37 at ¶ 176.  But the policy does not define "proper and justifiable."  *See* Docket Item 37-12 at 2-3; Docket Item 37 at ¶ 176.  As a result, although the "[p]laintiffs desire to purchase additional United States flags . . . for their '9/11 Never Forget Project,' they have not done so out of concern that [the Student Association] may claim any additional flags purchased as its own."  Docket Item 37 at ¶¶ 177-80.

The second amended complaint asserts six First Amendment claims based on several of the defendants' policies, including the UB Recognition Policy, the National Affiliation and Legal Status Bans, and the Acknowledgment Provision.  *Id.* at ¶¶ 201-97.  More specifically, the plaintiffs say that those provisions, both facially and as applied, (1) violate their right to expressive association by restricting some associations and compelling others, *id.* at ¶¶ 201-33 (first and second claims); (2) violate their right to free speech by compelling speech and by discriminating on the basis of content and viewpoint, *id.* at ¶¶ 234-68 (third and fourth claims); (3) violate their right to assemble, *id.* at ¶¶ 269-80 (fifth claim); and (6) impose unconstitutional conditions on their ability to access a speech forum, *id.* at ¶¶ 281-97 (sixth claim).  The plaintiffs seek declaratory

and injunctive relief and attorney's fees and costs against all the defendants, as well as an award of nominal damages only against the Student Association.[8]  *Id.* at 39.

Both the Student Association and the UB administrators moved to dismiss the second amended complaint, Docket Items 40 and 41, and the parties briefed those motions as described above.  After those motions were fully briefed, the plaintiffs filed a second motion for a preliminary injunction based on the Legal Status Ban.  Docket Item 46.  That motion asks this Court to enjoin the "[d]efendants . . . from enforcing [the] Legal Status Ban to the extent it (1) requires the derecognition of, or prohibits the recognition of, UB Young Americans for Freedom or (2) justifies the denial to UB Young Americans for Freedom of the benefits of recognized or registered status."  *Id.* at 1. Then parties then briefed that motion as described above.

## **LEGAL PRINCIPLES**

### I.     **MOTION TO DISMISS**

Under Federal Rule of Civil Procedure 12(b), a case may be dismissed for "lack of subject matter jurisdiction" or for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(1), (6).

---

[8] The UB administrators moved to dismiss the plaintiffs' claims for damages against them under the Eleventh Amendment.  Docket Item 40-1 at 9-10.  In response, the plaintiffs did not dispute that the Eleventh Amendment bars any damage claim against the UB administrators here, and they noted that the second amended complaint seeks nominal damages only from the Student Association—not from the UB administrators.  *See* Docket Item 42 at 9.  This Court agrees that the second amended complaint seeks nominal damages only against the Student Association.  *See* Docket Item 37 at 39.  So to the extent that the UB administrators move to dismiss the plaintiffs' claims for damages against them, that motion is denied as moot.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Id.* (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986)); *see N-N v. Mayorkas*, 540 F. Supp. 3d 240, 251 (E.D.N.Y. 2021) ("[C]ourts evaluating Rule 12(b)(1) motions 'may resolve the disputed jurisdictional fact issues by referring to evidence outside . . . the pleadings, such as affidavits.'" (quoting *Zappia v. Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000))). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113.

A complaint is properly dismissed for failure to state a claim under Rule 12(b)(6) if it does not include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

II.     **MOTION FOR A PRELIMINARY INJUNCTION**

"[P]laintiff[s] seeking a preliminary injunction must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Id.* at 24.

<u>**DISCUSSION**</u>

The plaintiffs bring First Amendment claims against the UB administrators and the Student Association based on various UB and Student Association policies: (1) the UB Recognition Policy, Docket Item 37-1; (2) the National Affiliation Ban, Docket Item 37-3; (3) the Acknowledgment Provision, which requires all club officers to certify compliance with the Legal Status Ban, Docket Items 37-5 and 37-6; and (4) several other Student Association policies governing the recognition of clubs and the approval of various club actions, Docket Items 37-7, 37-8, 37-9, 37-10, and 37-12.  The plaintiffs' claims against the UB administrators, however, simply allege that the UB Recognition Policy gives the Student Association the "authority and discretion" to adopt and enforce the other allegedly unconstitutional policies that the plaintiffs challenge.  *See, .e.g.*, Docket Item 37 at ¶¶ 45-46, 116-17, 119-20, 204, 213, 217-18, 232, 243, 253, 267, 279, 296.  In other words, the plaintiffs' claims against the UB administrators are rooted in the plaintiffs' contention that those defendants, through the UB Recognition Policy, have given the Student Association the power to implement other policies that violate their rights.  *See id.*  Thus, the plaintiffs' claims against the UB administrators (and based on

the UB Recognition Policy) turn on whether the Student Association's other policies are unconstitutional.

The Student Association advances various reasons that this Court should dismiss the plaintiffs' claims related to its policies.  *See* Docket Item 41-8.  This Court will examine each of those arguments in turn.  And for the reasons that follow, the Court concludes that it lacks subject matter jurisdiction over all claims related to the repealed National Affiliation Ban; that the plaintiffs' claims based on the Legal Status Ban and the Acknowledgment Provision fail to state a claim (and that the plaintiffs' motion for a preliminary injunction accordingly must be denied); and that the plaintiffs lack standing to challenge the Student Association's other policies governing the actions of clubs recognized by the Student Association.[9]

## I.   CLAIMS RELATED TO THE NATIONAL AFFILIATION BAN

The Student Association argues that this Court lacks subject matter jurisdiction over all claims related to the National Affiliation Ban.  Docket Item 41-8 at 16-20.  More specifically, the Student Association says that the plaintiffs lack standing to seek nominal damages based on the National Affiliation Ban and that the repeal of that provision mooted any claims for injunctive or declaratory relief based on it.  *Id.*  This Court agrees.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  In the words of the Supreme

---

[9] The exception is the Student Association's Club Recognition Policy, which the Court finds that the plaintiffs have standing to challenge but nonetheless is constitutional.  *See infra* note 32.

Court, Article III "restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013) (citation and internal quotation marks omitted). One of the requirements imposed in that regard is standing: "[P]laintiff[s] must show [that] (1) [they] ha[ve] suffered an injury in fact . . . ; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000)).

Article III also requires that a case not become moot during the course of litigation. In other words, "[a] corollary to th[e] case-or-controversy requirement is that an actual controversy must [exist] at all stages of review, not merely at the time the complaint is filed." *Genesis Healthcare*, 569 U.S. at 71 (citation and internal quotation marks omitted); *see also Klein on behalf of Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 222 (2d Cir. 2018) (explaining that "standing doctrine evaluates a litigant's personal stake as of the outset of the litigation, [and] mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit"). So "the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ. of Enlarged City Sch. Dist.*, 260 F.3d 114, 118 (2d Cir. 2001). "[A]nd if the dispute . . . dissolve[s] at any time due to a change in circumstances, the case becomes moot" and "must be dismissed" for lack of jurisdiction. *Id.* at 118-19 (citing *DeFunis v. Odegaard*, 416 U.S. 312, 316-17 (1974), and *Fox v. Bd. of Trs. of the State Univ. of N.Y.*, 42 F.3d 135, 139-40 & n. 2 (2d Cir.1994)).

The Student Association argues that the plaintiffs' claims related to the National Affiliation Ban are moot because the Student Association "repealed the challenged policy and implemented a different requirement . . . on July 3, 2023." Docket Item 41-8 at 17-19. Therefore, the Student Association says, there is "no live controversy between the parties" about the National Affiliation Ban and this Court lacks subject matter jurisdiction over any claims related to that provision. *See id.* at 18.

The plaintiffs do not dispute that the National Affiliation Ban is no longer in effect: In fact, their amended complaint specifically acknowledges that on July 3, 2023, in Resolution No. 7, the Student Association's Executive Committee "revoked" the National Affiliation Ban and "deemed [it] to never have taken effect, as . . . never implemented." Docket Item 37-5 at 6; Docket Item 37 at ¶ 101. The plaintiffs further note that Resolution No. 7 "restored recognition to . . . UB Young Americans for Freedom." Docket Item 37 at ¶ 104.

But the plaintiffs say that their claims based on the National Affiliation Ban still are not moot for two reasons. First, they "seek nominal damages" based on the National Affiliation Ban, and they say that such a claim "cannot become moot." Docket Item 43 at 14-15 (some bold omitted). Second, they say that their claims for injunctive and declaratory relief remain live because the Student Association has failed to show that its "repeal is conclusive" or that it is "absolutely clear that [the Student Association] could not revert to [the challenged] policy"; in fact, according to the plaintiffs, the National Affiliation Ban essentially "remains in effect" through the Acknowledgment Provision and the Legal Status Ban. *Id.* at 14-17 (citation and internal quotation marks omitted). Neither of those arguments saves the claims from mootness.

### A.    Nominal Damages

The plaintiffs correctly note that a party may seek damages—including nominal damages—even when the underlying statute, regulation, or policy is no longer in effect. *See Fox*, 42 F.3d at 141 (explaining that "relief in the form of damages for a past violation of [a] constitutional right[]" remains available even if corresponding claims for equitable relief are moot); *see* Docket Item 43 at 14-15.  Indeed, as the Supreme Court recently held in *Uzuegbunam v. Preczewski*, 592 U.S. 279, 796 (2021), a request for nominal damages alone can prevent a case from becoming moot.  *Id.* at 796; *see also id.* at 802 (Kavanaugh, J., concurring) (agreeing that "as a matter of history and precedent, a plaintiff's request for nominal damages can . . . keep an otherwise moot case alive").

But that does not mean that a plaintiff *always* may seek nominal damages to challenge a law or policy that no longer exists.  In *Uzuegbunam*, the Supreme Court stressed that "[its] holding . . . concern[ed] only redressability"; that is, "for the purpose[s] of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right."  *Id.* at 802.  A plaintiff still must establish standing to challenge the repealed law or policy, including by showing that it suffered a "particularized injury" as a result of that law or policy.  *Id.* at 802.

The Student Association argues that the plaintiffs have not shown that they suffered such an injury here, Docket Item 45 at 6-7, and this Court agrees.  "To establish injury in fact, [the] plaintiff[s] must show that [they] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)), *as revised* (May 24,

2016).  "[T]o be 'particularized,' [an injury] 'must affect the plaintiff in a personal and individual way.'"  *Id.* (citing *Lujan*, 504 U.S. at 560 n.1).

In *Uzuegbunam*, the Supreme Court held that the lead plaintiff, Chike Uzuegbunam, clearly "experienced a completed violation of his constitutional rights"—and thus an injury in fact—when university officials "enforced their speech policies against him."  592 U.S. at 802.  Uzuegbunam had twice begun to speak about his religious faith in public spaces on his college campus before being stopped by university officials.  *Id.* at 796-97.  But the Supreme Court did not make the same finding with respect to the second plaintiff in the case, Joseph Bradford, "who shares Uzuegbunam's faith . . . [and] decided not to speak about religion" on their campus after what happened to Uzuegbunam.  *Id.* at 797.  Instead, the Court declined to "decide whether Bradford[ could] pursue nominal damages," reiterating that "[n]ominal damages go only to redressability and are unavailable where a plaintiff has failed to establish a past, completed injury."  *Id.* at 802 n.2.[10]  The Court left it to the district court to "determine in the first instance whether the enforcement against Uzuegbunam also violated Bradford's constitutional rights."  *Id.*

The plaintiffs argue that like Chike Uzuegbunam, they suffered a completed violation of a constitutional right when they were "automatic[ally] derecogni[zed]" under the National Affiliation Ban on June 1, 2023.  Docket Item 43 at 14; *see Uzuegbunam*, 592 U.S. at 802.  Indeed, they say that although the Student Association's repeal of the National Affiliation Ban deemed the policy never to have gone into effect, Docket Item

---

[10] The footnotes in *Uzuegbunam* are not numbered, but this citation refers to the second and final footnote in that decision.

37-5, "[t]he Student Association and its Executive Committee lack the power to revise history or undo past events." Docket Item 37 at ¶¶ 102-03. Further, according to the plaintiffs, during the month that UB Young Americans for Freedom was "automatically derecognized," it lacked the power to take various actions. *See id.* at ¶¶ 86-89. More specifically, the plaintiffs assert that during that time, UB Young Americans for Freedom "could no longer receive any of the benefits afforded to recognized student organizations, and it was no longer eligible to receive the budget it was allocated from the mandatory student activity fee." *Id.* at ¶ 87. "For example," they say, "without th[o]se benefits, UB Young Americans for Freedom could not reserve table space in the Student Union, could not reserve classroom space for its weekly meetings, and could not reserve meeting space for guest speakers." *Id.* at ¶ 89.

These allegations—even taken as true—do not show that the plaintiffs suffered a completed violation of a constitutional right. That is, even assuming that the National Affiliation Ban in fact was in effect throughout the month of June and that the plaintiffs theoretically "could not have engaged" in various expressive activities, the plaintiffs do not allege that they were in fact prevented from engaging in any such activities or even that they would have attempted to engage in those activities but for the chilling effect of the National Affiliation Ban. *See id.*

Instead, the plaintiffs seemingly argue that because the National Affiliation Ban was on the books in June, that alone was a completed violation of their First Amendment rights. *See id.* at ¶¶ 86-89. But if that were enough to show an injury in fact, then the mere existence of an allegedly unconstitutional law or policy could always be said to inflict a completed injury upon a plaintiff—without any allegation that officials

enforced, or even threatened to enforce, that law against anyone.  Of course, that cannot be correct:  "*Uzuegbunam* made clear that [p]laintiffs do not automatically have standing to sue . . . merely because they request nominal damages."  *Allen v. Whitmer*, 2021 WL 3140318, at *2 (6th Cir. July 26, 2021).

The Sixth Circuit's decision in *Allen* is instructive.  *See id.*  There, the plaintiffs alleged that Michigan's Covid-19 travel restriction order had "barred [them] from travelling to and enjoying the use of [a timeshare] property" from April 17, 2020, until April 24, 2020," the week they were "entitled to use the [property]."  *Id.* at *1.  The restriction was lifted on April 24, 2020, prior to the commencement of the lawsuit.  *Id.*  The Sixth Circuit found that the plaintiffs had failed to plead an injury in fact sufficient to establish their standing to seek even nominal damages.  *Id.* at *3.  It noted that the plaintiffs "d[id] not allege":

> (1) that they actually travelled and were penalized for doing so, (2) that they attempted to travel but were deterred by a real threat that the [s]tate would enforce the travel restriction, (3) that that they attempted to invoke one of the many exceptions to [the travel restriction] that might have permitted them to travel to the timeshare, or (4) that they took any other action that might have demonstrated a sincere effort on their part to exercise the constitutional rights in question.

*Id.* (footnote omitted).  "While none of th[o]se allegations alone [necessarily] would have . . . sufficed to state an injury," the Sixth Circuit wrote, "the absence of *any* of them from [the] amended complaint proves fatal to [any] argument that they suffered actual, measurable harm."  *Id.*

In other words, the plaintiffs' allegations in *Allen* were "premised on their 'speculative fear' that if Michigan had enforced the travel restriction against them in a particular manner, then such hypothetical enforcement might have resulted in penalties against [them]."  *Id.* (emphases omitted).  That was not enough in *Allen*, and the parallel

allegations are not enough here.  Indeed, as the Second Circuit has explained, "[w]hile the fact that a plaintiff's speech has actually been chilled can establish an injury in fact, '[a]llegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'"  *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1060-61 (2d Cir. 1991) (quoting *Laird v. Tatum,* 408 U.S. 1, 13-14 (1972)).

Akin to *Allen*, the plaintiffs here assert that the National Affiliation Ban's "mere existence created a cognizable injury to them, such that [the court] must assess the law's constitutionality in the abstract."  2021 WL 3140318, at *3.  But that argument flies in the face of "Article III's prohibition against issuing advisory opinions."  *Id.*  So because the plaintiffs do not allege that they suffered a concrete or particularized harm based on the National Affiliation Ban, they lack standing to seek nominal damages.  *See id.*; *Bordell*, 922 F.2d at 1061.

### B.    Injunctive and Declaratory Relief

The plaintiffs also argue that their claims for injunctive and declaratory relief based on the National Affiliation Ban "remain live" despite its repeal.  Docket Item 43 at 15-17; Docket Item 37 at 39.  They argue that a defendant's "voluntary cessation" of a challenged activity moots a case only under certain circumstances not present here. Docket Item 43 at 15-17.  Again, this Court disagrees.

It is true that a defendant's "voluntary cessation of allegedly illegal conduct does not [necessarily] deprive the tribunal of power to hear and determine the case."  *Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (citation and internal quotation marks omitted).  Instead, under the "voluntary cessation" exception, a "defendant

claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190 (identifying "voluntary cessation" as a "long-recognized exception[] to mootness"). And to meet that burden, the defendant must show that (1) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation" and (2) "there is no reasonable expectation that the alleged violation will recur." *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002).

### 1.    Eradication of effects

The Student Association says that because the National Affiliation Ban—according to the terms of the resolution repealing it—was "never implemented" and in fact was "deemed to never have taken effect," there necessarily are no remaining "effects" of that policy to "eradicate[]." *See Granite State*, 303 F.3d at 451; *see Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 88 (2d Cir. 2005) (explaining that when "challenged conduct has only been proposed but never implemented," mootness analysis centers on whether there is a reasonable expectation of recurrence); Docket Item 41-8 at 17-19. And while the plaintiffs disagree with that characterization, asserting that "[t]he Student Association and its Executive Committee lack the power to revise history or undo past events," Docket Item 37 at ¶¶ 102-03, they concede that at least since July 3, 2023, UB Young Americans for Freedom has been and remains a recognized student organization of the Student Association, *see id.* at ¶ 104 (plaintiffs' statement that Resolution No. 7 "restored recognition" to UB Young Americans for

Freedom); *see also* Docket Item 46-1 at 22 (stating that UB Young Americans for Freedom currently is recognized by Student Association).

Nevertheless, according to the plaintiffs, UB Young Americans for Freedom was "automatically derecognized" for roughly one month during which the organization was unable to take various actions. *See* Docket Item 37 at ¶¶ 86-89. Therefore, they say, the effect of the National Affiliation Ban cannot be eradicated, at least insofar as it already caused a constitutional injury. But as discussed above, the plaintiffs have not shown that they suffered any cognizable injury as a result of the National Affiliation Ban before it was repealed. *See supra* Section I.A. And while the plaintiffs contend that their First Amendment rights still are being unconstitutionally denied, it is undisputed that any such violations are the result of the Acknowledgment Provision and the Legal Status Ban, not the repealed National Affiliation Ban. *See* Docket Item 37 at ¶ 119 (stating that the Student Association "repeal[ed] the National Affiliation Ban and replace[d] it with a 'different requirement' (i.e., reinvigorated enforcement of the Legal Status Ban) to accomplish the same speech-restricting objective using different means"); *id.* at ¶ 128 (stating that "[t]o gain status as a recognized student organization and to conduct any action as officers, [the p]laintiffs must sign the 'Acknowledg[]ment of Club Officer Responsibilities' form that includes the Legal Status Ban"); *see also Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 110 (2d Cir. 2016) (holding effects of old policy eradicated where "any restriction on [the plaintiff's] speech at th[e] time [of the decision wa]s a consequence of the [defendant's] new advertising policy, not a relic of its old one").

Thus, any effects of the National Affiliation Ban have been eradicated.

## 2.    No reasonable expectation of recurrence

The Student Association says that because it now has implemented "a different requirement . . . to address the . . . concerns that [it] sought to address with the [National Affiliation Ban], there is no reasonable expectation of [that provision's] recurrence" here.  Docket Item 41-8 at 18.  Again, it is undisputed that on July 3, 2023, the Student Association "repealed" the challenged provision and "replaced" it "with a different requirement."  *See* Docket Item 37 at ¶ 105; Docket Item 41-8 at 18; Docket Item 37-5.  Further, according to an affidavit filed by the Student Association's president for the 2022-2023 and 2023-2024 school years, because the National Affiliation Ban was "replaced with a different requirement, [the Student Association] will take no action whatsoever, pursuant to the now-repealed policy, to deny either recognition or any of the benefits of recognition to any clubs that fail to comply with the now-repealed policy."  Docket item 41-1 at ¶ 44.

In *College Standard Magazine v. Student Association of State University of New York at Albany*, 610 F.3d 33 (2d Cir. 2010), the Second Circuit held that claims based on a repealed university policy were moot under facts similar to those here.  *Id.* at 34-36.  There, a "campus organization . . . and its founders" at another state university of New York, SUNY Albany, brought a First Amendment challenge to the university's funding policy, which the plaintiffs argued gave the SUNY Albany Student Association "unbridled discretion to decide how to distribute" the "proceeds of [the university's] mandatory student activity fee to student groups."  *See id.* at 34 (internal quotation marks omitted).  After the plaintiffs filed their lawsuit, the SUNY Albany Student Association "amended its constitution . . . to include regulations on funding that explicitly require[d] viewpoint neutrality."  *Id.*  The Second Circuit held that the "repeal of the

challenged policy" rendered the plaintiffs' claims moot. *Id.* at 34-35; *see also id.* at 34

("We are thus asked to consider the constitutionality of a funding policy that is no longer

in effect, and that is not alleged to have caused the plaintiffs harm when it was in effect.

This we cannot do.").

Other courts have come to similar conclusions when considering challenges to

revoked university policies. *See Husain v. Springer*, 193 F. Supp. 2d 664, 670

(E.D.N.Y. 2002) (holding that repeal of university's rule governing student elections

rendered moot plaintiffs' claim for injunctive and declaratory relief based on that rule

where plaintiffs offered only "conclusory and speculative arguments" that rule might be

reinstated), *aff'd*, 494 F.3d 108 (2d Cir. 2007); *Young Am.'s Found. v. Kaler*, 14 F.4th

879, 886-87 (8th Cir. 2021) (university administration's replacement of challenged

"[m]ajor [e]vents" policy rendered plaintiff's challenge to old policy moot); *ASU Students

For Life v. Crow*, 357 F. App'x 156, 157-58 (9th Cir. 2009) (holding claims based on

university's "one-zone and insurance policy" moot in light of "revisions" to that policy

where plaintiff was "not challeng[ing] th[e] new policy"; "[i]t [wa]s absolutely clear that

[the university would] not revert to [the old] policy"; and university had "stated in open

court that [it] would not return to that policy"). And while courts have acknowledged that

the "[d]efendants['] burden concerning the unlikelihood of recurrence is a heavy one,"

they also have noted that "it by no means requires proof approaching metaphysical

certitude" and that "some reason must support [the plaintiffs'] insistence that [an]

alleged violation is likely to recur." *Comm. for First Amend. v. Campbell*, 962 F.2d 1517,

1525 (10th Cir. 1992) (district court did not err in determining without an evidentiary

hearing that case was moot in light of new Regents Board policy); *see Springer*, 193 F.

Supp. 2d at 670 (although university's "commitment [not to reinstate challenged policy did] not extend indefinitely into the future," court held that "[b]y agreeing not to reinstate the challenged rule or engage in the challenged behavior, defendants ha[d] met their burden of showing that the alleged violation [wa]s unlikely to recur" (citation and internal quotation marks omitted)).

Nevertheless, the plaintiffs say that the Student Association has failed to meet its "heavy burden" to show that it is "absolutely clear" that it will not "revert" to the National Affiliation Ban for two reasons. *See* Docket Item 43 at 15. First, they contend that under *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), the mere repeal of "challenged . . . language" does not prevent a defendant "from reenacting precisely the same provision." Docket Item 43 at 15 (citing *Aladdin's Castle*, 455 U.S. at 289). Second, they argue that in this case, there is more than a "risk" that the defendants "will repeat [their] allegedly wrongful conduct" because they "already [have] done so" through the Acknowledgment Provision and the Legal Status Ban. *Id.* at 16 (alterations in original) (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)); *see also id.* (stating that the Legal Status Ban "grant[s]" the Student Association "unbridled discretion over whether student groups can affiliate with off-campus entities"). And that, they say, makes this case unlike *College Standard Magazine*, *ASU Students for Life*, and *Kaler*, where the constitutionality of the new policies was not in dispute. *Id.* at 16-17 (citing *Coll. Standard Mag.*, 610 F.3d at 34; *ASU Students for Life*, 357 F. App'x at 157; and *Kaler*, 14 F.4th at 886).

Those arguments are unavailing. First, as the Second Circuit has explained, the case upon which the plaintiffs rely here—*Aladdin's Castle*—"was unusual . . . in that the

defendant city had amended its ordinance numerous times in response to court rulings and had expressed an intent to reenact the offending provisions were the litigation to be dismissed for lack of jurisdiction." *See Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 376 (2d Cir. 2004) (citing *Aladdin's Castle*, 455 U.S. at 289 & n.11). Indeed, as the court held in an opinion by then Judge Sotomayor, "deference to [a] legislative body's decision to amend is the rule, not the exception." *Id.* at 377. And in light of that deference, the court was "hesitant to hold that a significant amendment or repeal of a challenged provision that obviates the plaintiff's claims does not moot a litigation," at least "absent evidence that the defendant intends to reinstate the challenged statute after the litigation is dismissed"—as in *Aladdin's Castle*—"or that the [legislative body] itself does not believe that the amendment renders the case moot." *Id.*

Here, as in *Lamar*, a legislative entity has passed a new provision that repeals the challenged one. While *Lamar* involved a town board's ordinance and the entity that repealed the challenged provision in this case is a student government body organized as a "non-profit membership corporation," Docket Item 37 at ¶¶ 33-37, 58-59; Docket Item 37-1 at 4; *see also* Docket Item 41-1 at ¶ 3 (identifying Student Association as "the undergraduate student government at [UB]" and stating that "[a]ll of its departments are student-run" and all "[i]ts representatives are elected by students"), that distinction is irrelevant. As already noted, in *College Standard Magazine*, the Second Circuit found that a student association's amendment of its constitution was enough to moot the case. 610 F.3d at 34. And courts have come to the same conclusion in cases involving changes to university policy more generally. *See ASU Students for Life*, 357 F. App'x at 157; *Kaler*, 14 F.4th at 886; *Comm. for First Amend.*, 962 F.2d at 1524-26. Moreover,

28

as in *Lamar* and *Springer*, the Student Association has amended the challenged rule

and disclaimed any current plans to enforce the old version.  Docket Item 37 at ¶¶ 105-

08; Docket Item 41-1 at ¶ 44; *see Lamar*, 356 F.3d at 377; *Springer*, 193 F. Supp.2d at

670.

As to the plaintiffs' second argument, whether a plaintiff continues to challenge

the current law after repeal of the prior one is not relevant to the mootness

determination.  *See Lamar*, 356 F.3d at 376 (rejecting plaintiff's "attempt[] to distinguish"

an earlier case on the grounds that unlike in the instant case, the plaintiff in the earlier

case "did not contend that the amended . . . regulations [we]re unconstitutional, and

thus there was no reason to believe that any unconstitutional restrictions were currently

in place" (citation and internal quotation marks omitted)).  Instead, the question is

whether the amended provisions are "sufficiently altered so as to present a substantially

different controversy."  *Id.* at 377-78.  That is, "[a] plaintiff's claims will not be found moot

[if] the defendant's amendments are merely superficial or the law, after amendment,

suffers from similar infirmities as it did at the outset."  *Id.* at 378.  And here, the

amended provisions present an entirely new controversy.[11]

---

[11] In fact, the new provision itself is a good reason to believe that the Student Association will not revert to the earlier ban.  *See* Docket Item 37-5 (Student Association's statement in Resolution No. 7 that it "now desire[d] to attempt to address an underlying concern reflected in th[at p]olicy but in a different manner").  Indeed, the plaintiffs contend that the Student Association implemented the Acknowledgment Provision as "an alternative way to accomplish the same goals as the National Affiliation Ban."  Docket Item 37 at ¶ 260; *see also id.* at ¶¶ 8-10 (stating that in repealing the National Affiliation Ban and enacting the Acknowledgment Provision, the "[d]efendants did not abandon their goal of restricting expression that they or others disliked" but "[r]ather . . . merely decided to restrict it in a different way").  And so there would seem to be little reason—on the face of the plaintiffs' own pleadings—for the Student Association to revert to the challenged policy.

The Supreme Court's decision in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville* is instructive in this regard. In that case, the Court held that a city's amendment of an ordinance setting certain requirements for the percentage of the city's contracting funds to be used for "[m]inority [b]usiness [e]nterprises" did not moot the case. 508 U.S. at 658, 661-62. There, the amended provisions limited the definition of "[m]inority [b]usiness [e]nterprises," altered the required percentages, and provided additional mechanisms for meeting those requirements; the Court held that because the new version affected the plaintiffs in "the same fundamental way," their claims with respect to the old version were not moot. *Id.*; *see Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (explaining that in *Northeastern Florida*, the defendant city "repealed the ordinance and replaced it with a *substantially similar one*" (emphasis added)).

In contrast, the Second Circuit has found provisions "sufficiently altered" so as to moot claims regarding the old version when the amendment removed a challenged provision and added another that the plaintiff had complained was lacking, *see Lamar*, 356 F.3d at 378, and when the changes "explicitly sought to remedy" the "defect identified," *Chrysafis v. Marks*, 15 F.4th 208, 214 (2d Cir. 2021); *see also Kaler*, 14 F.4th at 886-87 (university administration's replacement of challenged "[m]ajor [e]vents" policy rendered plaintiff's challenge to old policy moot where new policy "did not merely repackage [the old policy] under a new banner but instead amended the substance of the policy seemingly to address" plaintiffs' concerns and plaintiff "ha[d] not shown that it [was] 'virtually certain' that the [old policy would] be reenacted" (citation omitted)).

So whether the current provisions might themselves be unconstitutional does not affect whether the case remains live; the question is whether the amended version "present[s] a substantially different controversy." *Lamar*, 356 F.3d. at 377-78 (challenge to old provisions was moot despite fact that new provisions might "present new constitutional problems"); *Chrysafis*, 15 F.4th at 214 (claims against old version of statute were moot although plaintiffs continued to challenge current version as unconstitutional). Stated another way, the mere fact that a plaintiff alleges that both the old and new regimes violate the same rights does not mean that the new version disadvantages that plaintiff in "the same fundamental way." *See Chrysafis*, 15 F.4th at 214 n.8 (distinguishing *Northeastern Florda* and holding that because the amended language "add[ed] an opportunity for . . . [l]andlords to obtain a hearing to challenge a tenant's hardship declaration," the new statute did not disadvantage the plaintiff landlords in "the same fundamental way" even though the plaintiffs asserted that the new statute, like the old one, violated their due process rights).

Here, even if the Student Association's current policies violate the plaintiffs' First Amendment rights, that violation presents a "substantially different controversy" than the earlier one because the language and mechanisms of the repealed National Affiliation Ban, on the one hand, and the Acknowledgment Provision and Legal Status Ban, on the other, are entirely distinct. *See* Docket Item 37 at ¶¶ 78, 92-95, 105-08; *see also Lamar*, 356 U.S. at 377-78. In fact, the plaintiffs themselves assert that the new regime "accomplished the same objective[s] as the National Affiliation Ban, using *different means*." Docket Item 37 at ¶ 108 (emphasis added). More specifically, the plaintiffs argue that the new policy violates their right to associate with an outside group not

through an outright "ban" but by "[s]ubjecting th[at] right to an unbridled discretion review."  *See* Docket Item 43 at 16.

In other words, as in *Lamar*, *Chrysafis*, and *Kaler*, the new policy did not simply change certain details about the old scheme; it entirely repealed and replaced that scheme to address concerns that had been raised about it.  *See* Docket Item 37-5.  Of course, the plaintiffs' claims against the present policy are not moot, and the Court addresses them below.  But the simple fact that the plaintiffs challenge what replaced the National Affiliation Ban—namely, the Acknowledgment Provision—does not keep the plaintiffs' claims against the National Affiliation Ban alive.[12]  *See Viewpoint Neutrality Now! v. Powell*, 653 F. Supp. 3d 621, 631 (D. Minn. 2023) (holding that plaintiffs' challenge to funding process was moot because "the [u]niversity ha[d] substantively changed th[at] process since [the] plaintiffs filed their complaint and there [was] no evidence that the [u]niversity [was] certain (or even likely) to resurrect the old process in the future"), *aff'd sub nom. Viewpoint Neutrality Now! v. Bd. of Regents*, 109 F.4th 1033 (8th Cir. 2024); *see also Chrysafis*, 15 F.4th at 216 (noting that Supreme Court's general practice in cases in which there has been "an intervening [legislative] change [that] has mooted certain claims[] but left open the possibility that new and related

---

[12] The plaintiffs also say that their claims against the National Affiliation Ban are not moot because the Student Association "still defends the National Affiliation Ban" and that courts "routinely reject mootness claims when universities still defend their policies." *See* Docket Item 43 at 15-16 (citations omitted); Docket Item 45 at 6-7.  But "[n]o matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights."  *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation and internal quotation marks omitted).  The mere fact that the Student Association asserts that the National Affiliation Ban was constitutional does not—in the absence of any showing that they are likely to resurrect it—create a live controversy here.

claims might arise under the new . . . scheme" is not to decide the claims based on the old version but to vacate the underlying decision for the courts below to consider "the possibility that new and related claims might arise under the new statutory scheme" (collecting cases)).

In sum, the plaintiffs have offered no evidence that the Student Association is likely to reinstate the National Affiliation Ban.  And while they say that the Student Association's replacement of it with the Acknowledgment Provision simply "reinvigorated enforcement" of the Legal Status Ban to accomplish the same purpose, *see* Docket Item 37 at ¶ 119, that presents a "substantially different controversy," *Lamar*, 356 F.3d. at 377-78, which is not enough to refute the Student Association's showing that the challenged behavior is unlikely to recur, *see* Docket Item 37 at ¶¶ 105-08; Docket Item 41-1 at ¶ 44.  Because "interim relief or events have completely and irrevocably eradicated [any] effects" of the National Affiliation Ban and "there is no reasonable expectation that the alleged violation will recur," *see Granite State*, 303 F.3d at 451, the voluntary cessation exception to the mootness doctrine does not apply.  And for that reason, the plaintiffs' claims for injunctive and declaratory relief based on the National Affiliation Ban are dismissed against all defendants.[13]

<p style="text-align:center">*     *     *</p>

---

[13] As already explained, because the plaintiffs lack standing to seek nominal damages based on the National Affiliation Ban, their request for that relief does not keep their claims alive.  *See supra* Section I.A.  Further, the plaintiffs' request for attorney's fees and costs, Docket Item 37 at 39, "does not affect th[e mootness] calculus."  *Marciano v. Adams*, 2023 WL 3477119, at *1 n.1 (2d Cir. May 16, 2023) (explaining that "where 'the only remaining issues would be attorney['s] fees and costs, neither' would be 'sufficient to keep the dispute alive'" (quoting *London v. Polishook*, 189 F.3d 196, 200 (2d Cir. 1999))), *cert. denied*, 144 S. Ct. 286 (2023).

Therefore, and for all the reasons stated above, the plaintiffs' claims based on the National Affiliation Ban are dismissed without prejudice for lack of subject matter jurisdiction.

## II.   CLAIMS RELATED TO THE LEGAL STATUS BAN AND THE ACKNOWLEDGMENT PROVISON

The Court now turns to the plaintiffs' claims that the Acknowledgment Provision and the Legal Status Ban violate their First Amendment rights.  More specifically, the plaintiffs allege that those provisions (1) violate their First Amendment rights to expressive association, free speech, and assembly; (2) confer "unbridled discretion" upon the Student Association to discriminate based on content and viewpoint, also violating their right to free speech; and (3) condition access to the Student Association forum on plaintiffs' giving up their constitutional rights.  Docket Item 37 at ¶¶ 201-97.  The defendants argue that none of those allegations state a viable claim.  Docket Items 40-1 and 41-8.

### A.   Threshold Questions

Before this Court can assess the merits of the plaintiffs' constitutional claims, it must determine what standards of review apply to those claims.  And to do that, the Court addresses (1) the kind of claims that plaintiffs are bringing; and (2) what level of scrutiny applies to each.

### 1.   Facial and as-applied challenges

"[T]here are two ways to challenge a statute on First Amendment . . . grounds." *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006).  "A 'facial challenge' to a statute considers only the text of the statute itself, not its application to

the particular circumstances of an individual." *Id.* (citing *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 770 n.11 (1988)). "An 'as-applied challenge,' on the other hand, requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Id.* at 174-75 (citing *Wis. Right to Life, Inc. v. FEC*, 546 U.S. 410 (2006)).

Here, the plaintiffs assert that the Acknowledgment Provision and the Legal Status Ban violate their rights "both facially and as[ ]applied." Docket Item 37 at ¶¶ 220, 233, 244, 268, 280, 297.

### 2.    Level of scrutiny

Courts "analyze speech restrictions on publicly owned property according to a forum-based approach." *Tyler v. City of Kingston*, 74 F.4th 57, 61 (2d Cir. 2023); *see Christian Legal Soc. v. Martinez*, 561 U.S. 661, 679 (2010) ("[The Supreme] Court has employed forum analysis to determine when a governmental entity, in regulating property in its charge, may place limitations on speech."). "Under this approach, '[f]ora for expression are classified into four categories, which fall along a spectrum extending from those deserving the greatest constitutional protection to those deserving the least constitutional protection: (1) the traditional public forum; (2) the designated public forum; (3) the limited public forum; and (4) the non-public forum.'" *Tyler*, 74 F.4th at 61 (alteration in original) (quoting *R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 539 (2d Cir. 2011)).

Both sides agree that "the student organization forum here is a limited public forum." Docket Item 42 at 9; *see* Docket Item 40-1 at 10-11; Docket Item 41-8 at 22-23;

*accord Martinez*, 561 U.S. at 669, 679 (treating university's registered student organization program as a "limited public forum"); *Amidon v. Student Ass'n of State Univ. of New York at Albany*, 508 F.3d 94, 100-01 (2d Cir. 2007) ("A pool of [university] student activity fees to fund private speech is a limited public forum in which forum principles apply."). They disagree, however, about whether limited public forum analysis provides the proper framework for all of the plaintiffs' First Amendment claims. The Student Association argues that it does. *See* Docket Item 40-1 at 11-14. The plaintiffs, on the other hand, dispute the continued vitality and applicability of *Martinez* and contend that limited public forum analysis provides the framework only for their free speech and free assembly claims. *See* Docket Item 43 at 19-22. And for that reason, they say that this Court should separately analyze their expressive association, compelled speech, and unconstitutional conditions claims under different standards.[14] *See id.*

In *Martinez*, the Supreme Court considered free speech and expressive association claims brought by a student group, the Christian Legal Society ("CLS"), at the University of California's Hastings College of the Law. 561 U.S. at 678-83. The Court rejected CLS's argument that those claims should be analyzed "independently" under separate "line[s] of" Supreme Court precedent. *Id.* at 680. Instead, the Court "conclude[d] that [its] limited[ ]public[ ]forum precedents suppl[ied] the appropriate framework for assessing both CLS's speech and association rights" for three reasons. *Id.*

---

[14] The plaintiffs concede that their "freedom of assembly claim is subject to the same test as [a] speech [claim] in [a limited public] forum." Docket Item 43 at 26.

First, the Court noted that "speech and expressive[ ]association rights are closely linked," such that "[w]hen th[o]se intertwined rights arise in exactly the same context, it would be anomalous for a restriction on speech to survive constitutional review under [the] limited[ ]public[ ]forum test only to be invalidated as an impermissible infringement of expressive association."  *Id.* at 680-81.  "Second," and "related[ly]," the Court held that "[t]he same ground rules must govern both speech and association challenges in the limited[ ]public[ ]forum context, lest strict scrutiny trump a public university's ability to 'confine a speech forum to the limited and legitimate purposes for which it was created.'"  *Id.* at 681 (alterations omitted) (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995)).  And "[t]hird," the Court held that "this case fits comfortably within the limited[ ]public[ ]forum category, for CLS, in seeking what is effectively a state subsidy, faces only indirect pressure to modify its membership policies."  *Id.* at 682.

The plaintiffs argue that *Martinez* does not provide the proper framework for assessing all its claims because (1) the facts at issue here are distinguishable from those in *Martinez*, and (2) "more recent Supreme Court rulings call into question *Martinez*'s merging of the analyses."  Docket Item 43 at 19-20.  But this Court sees no reason why the limited public forum analysis of *Martinez* would not apply here, nor does it have any reason to believe that *Martinez* is not still good law.

In *Martinez*, the student group, CLS, challenged the university's "Nondiscrimination Policy," which required all registered student organizations to accept "all comers"; under the policy, all registered student organizations were required to "allow any student to participate, become a member, or seek leadership positions in the

organization, regardless of [the student's] status or beliefs."  *Id.* at 670-71.  CLS's application to be a registered student organization was denied based on its failure to comply with that policy:  It had its own rule restricting membership "based on religion and sexual orientation."  *Id.* at 672-73.  And because it was not a registered student organization, CLS was unable to access funds from the "mandatory student[ ]activity fee imposed on all students."  *Id.* at 669-670, 674.

This case involves parallel policies governing the recognition of student organizations at a university and access to funds from a student activity fee.  *See generally* Docket Item 37.  But the plaintiffs say that it still is distinguishable because "the Legal Status Ban does not *just* affect what messages [the p]laintiffs can communicate or avoid"; "[i]t also prevents [UB] Young Americans for Freedom from existing as a distinct group, defending its rights in court, accessing its own funds, and doing all the things that a group does to operate" such that their "associational rights extend beyond their free speech rights."  Docket Item 43 at 19-20 (internal citations omitted).  In contrast to *Martinez*, the plaintiffs say, "'these intertwined rights' do *not* 'arise in exactly the same context,'" and it would make little sense "to reduce the scrutiny applied to each to the lowest common denominator."  *Id.* at 20 (quoting *Martinez*, 561 U.S. at 681).  They further argue that in *Martinez*, the question was whether a university could "limit" its forum to "certain groups"—"'a defining characteristic of limited public forums.'"  *Id.* (quoting *Martinez*, 561 U.S. at 681).  Here, on the other hand, they say that "the question is not whether [UB] Young Americans for Freedom belongs in [the] Student Association's forum" but "whether the group can continue to exist as a distinct organization []not absorbed into [the] Student Association."  *Id.*

That argument misunderstands *Martinez*.  The Court's basis for considering the free speech and expressive association claims together was that in the context of a state university's recognized student organization program, the analysis of a group's free speech rights and its associational rights necessarily "merge."  *Martinez*, 561 U.S. at 680.  Indeed, in *Martinez*, the Court noted that CLS's argument hinged on the notion that "[*w]ho* speaks on its behalf . . . colors *what* concept is conveyed."  *Id.*  The same is true here:  While the plaintiffs bring various claims against the Legal Status Ban and the Acknowledgment Provision, the crux of the second amended complaint is that those regulations impact the structure of UB Young Americans for Freedom and thus the messages the plaintiffs are able to convey.  *See, e.g.*, Docket Item 37 at 19 (asserting that the "[d]efendants' policies strip [the p]laintiffs . . . of their right to associate by prohibiting them from contracting, holding funds, or even owning property for expressive events" (bold omitted)); *id.* at 24 (stating that "[the d]efendants' policies merge [the p]laintiffs into one student organization—[the] Student Association—and compel them to associate with other groups who express messages with which they disagree" (bold omitted)).

In other words, the Supreme Court's decision in *Martinez* did not reduce First Amendment claims to the "least common denominator," *see* Docket Item 43 at 21; rather, it recognized that in this particular context—that of a university's recognized student organization program—the rights to expressive association and free speech are intertwined.  *See Martinez*, 561 U.S. at 680-81.  Further, as in *Martinez*, the question in this case concerns whether the university's policies unconstitutionally exclude a student organization from certain benefits.  *See* Docket Item 37.  The plaintiffs can—and do—

challenge the constitutionality of those policies, but they cannot leapfrog over prevailing precedent on the pretense that the "real" question here is "whether [UB Young Americans for Freedom] can continue to exist."  *See* Docket Item 43 at 20.

The plaintiffs also argue that *Martinez*'s reason for merging analyses—that is, that a student activity fee is a "state subsidy"—is "contradicted by all other Supreme Court student[ ]fee cases" and, for that reason, apparently should be disregarded by this Court.  Docket Item 43 at 20 n.8 (citations omitted).  But that, too, fails to provide a basis for this Court to deem *Martinez* inapplicable.

As an initial matter, the plaintiffs cite only two cases in support of this argument— *Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217 (2000) ("*Southworth I*"), and *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, both of which precede *Martinez.  See* Docket Item 43 at 20 n.8.  So insofar as there is a "contradict[ion]" in the Supreme Court's characterization of the student activity fee across those decisions, *see id.*, it would seem that *Martinez*, rather than the earlier cases, should control.

But this Court is not convinced that there is any such contradiction.  *Martinez* effectively characterized the distribution of the "student activity fee" as a *benefit* offered by the state rather than a direct regulation of conduct.  561 U.S. at 683 ("Application of the less restrictive limited[ ]public[ ]forum analysis better accounts for the fact that Hastings, through its [registered student organization] program, is dangling the carrot of subsidy, not wielding the stick of prohibition.").  That understanding is consistent with *Rosenberger* and *Southworth I.  See Rosenberger*, 515 U.S. at 829 (finding that defendant university was "expend[ing] funds to encourage a diversity of views from

40

private speakers"); *Southworth I*, 529 U.S. at 233 (holding that university was "entitled to impose a mandatory fee to sustain an open [campus] dialogue"). The language that the plaintiffs quote to the contrary rejected characterizing the programs at issue as *government* speech, which in *Rosenberger* would have presented a potential Establishment Clause issue and in *Southworth I* would have led to a *less* rigorous standard of review for the plaintiffs' claims. *See Rosenberger*, 515 U.S. at 840 (noting that "[t]he neutrality of the [university] program distinguishes the student fees from a tax levied for the direct support of a church or group of churches"); *Southworth I*, 529 U.S. at 235 ("When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy."). So again, the plaintiffs have not identified any reason for this Court to discount *Martinez*.[15]

Further, the more recent cases cited by the plaintiffs do not suggest that *Martinez*'s merging of the analyses no longer applies in the specific context of a university's recognized student organization program. *See* Docket Item 43 at 20-21.

---

[15] As the plaintiffs point out, Justice O'Connor's concurrence in *Rosenberger* described the student activity fee as "a fund that simply belongs to the students" rather than a "government resource[] . . . derived from tax revenue, sales of assets, or otherwise." *Rosenberger*, 515 U.S. at 851-52 (O'Connor, J., concurring); *see* Docket Item 43 at 20 n.8. And that characterization may indeed be in some tension with the way the Court understood the student activity fee in *Martinez*. But the plaintiffs do not explain why this Court should follow the concurring opinion of a single justice instead of a majority opinion in a later case. Indeed, Justice O'Connor's characterization of the student activity fee at issue in *Rosenberger* is in tension not just with *Martinez* but with *Southworth I* as well. *Compare Rosenberger*, 515 U.S. at 851 (O'Connor, J., concurring) (noting "the possibility that the student fee is susceptible to a Free Speech Clause challenge by an objecting student that she should not be compelled to pay for speech with which she disagrees"), *with Southworth I*, 529 U.S. at 235 (dismissing such a challenge).

First, none of those cases involved challenges to university policies.  *See 303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) (challenging state law barring discrimination in public accommodations); *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) (challenging application of employment discrimination law to firing of teacher at religious elementary school); *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 383-84 (2011) (challenge by police officer that he was fired in "retaliation for . . . protected [First Amendment] activity");[16] *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 129 (2d Cir. 2013) (challenge that "state officials . . . discriminatorily la[id] off only union members when reducing the state's work force"); *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 148-49 (2d Cir. 2020) (challenging state agency's rule barring adoption agencies from discriminating "against applicants for adoption services on the basis of . . . sexual orientation . . . or . . . marital status" (citation, emphases, and internal quotation marks omitted)); *Slattery v. Hochul*, 61 F.4th 278, 283 (2d Cir. 2023) (challenging state statute "prohibit[ing] employers from taking adverse employment actions against employees for their reproductive health decisions"

---

[16] The plaintiffs cite *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011), for the proposition that "[c]ourts should not presume . . . that Speech Clause precedents necessarily and in every case resolve [expressive association] claims."  Docket Item 43 at 21 (alteration in original) (citing *Guarnieri*, 564 U.S. at 388).  But in the first place, *Guarnieri* concerned the right to "petition for redress of grievances"—not the right to engage in expressive association.  *See Guarnieri*, 564 at 387-88.  Indeed, the sentence cited by the plaintiffs refers to the "Speech Clause" and the "Petition Clause":  It says that "[c]ourts should not presume . . . that Speech Clause precedents necessarily and in every case resolve *Petition Clause* claims."  *Id.* at 388 (emphasis added).  In any event, even if this holding did apply to expressive association claims, it would not mean that the analyses *never* merge in *any* case, just that they do not always do so.

(alteration, citation, and internal quotation marks omitted)).  In fact, the majority opinions in those cases do not even mention *Martinez*.[17]

In other words, even if free speech and expressive association claims must be analyzed separately in other contexts, *Martinez* says that is not the case here.  There is something unique about a university's student organization forum that distinguishes it from other contexts, and the Supreme Court has recognized exactly that.  *See Martinez*, 561 U.S. at 681 (noting that applying strict scrutiny to a public university's restrictions on limited public fora might hinder that university's ability to maintain those spaces for the "limited and legitimate purposes for which [they were] created" (quoting *Rosenberger*, 515 U.S. at 829)); *Southworth I*, 529 U.S. at 230-32 (rejecting argument that earlier cases involving First Amendment rights "in the [labor union] context" governed challenge to public university's distribution of student activity fee).

Finally, the fact that the plaintiffs raise issues of compelled speech and unconstitutional conditions does not preclude application of limited public forum analysis.  As to compelled speech, the plaintiffs assert that "compelled speech cases are not subject to forum analysis," but they provide no citation for that assertion.  Docket Item 43 at 20-21.  Elsewhere in their brief, they cite *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878 (2018), for the proposition that compelled speech "violates a 'cardinal constitutional command,'" therefore "trigger[ing] strict

---

[17] Justice Sotomayor's dissent in *303 Creative* argued that the majority's view of the state law at issue in that case was "astonishing" and—citing *Martinez*—"contrary to the fact that a law requiring public-facing businesses to accept all comers is 'textbook viewpoint neutral.'"  *303 Creative*, 600 U.S. at 635-636 (Sotomayor, J., dissenting) (quoting *Martinez*, 561 U.S. at 695).  But at most, that suggests that *Martinez*'s holding is not applicable to First Amendment cases outside the public university (or limited public forum) context, not that it is no longer good law in that setting.

scrutiny anywhere." Docket Item 43 at 25 (quoting *Janus*, 585 U.S. at 892). But *Janus* involved a free speech challenge in the union context, 585 U.S. at 884, and as already discussed, *Southworth I* distinguished the university setting from that of a union, 529 U.S. at 230-32. In fact, *Southworth I* rejected the argument that the Court's "compelled speech precedents" controlled the case, holding instead that a university could impose a "mandatory fee to sustain an open dialogue" as long as the "allocation of funding" was "viewpoint neutral." *Id.* at 227, 230-33.

The same is true with respect to the plaintiffs' unconstitutional conditions claim, as the Second Circuit found in *Boy Scouts of America v. Wyman*, 335 F.3d 80 (2d. Cir. 2003). That case involved the exclusion of an organization from a government program, and the court held that "it ma[d]e[] no difference . . . [w]hether [the organization's exclusion was] viewed as denial of access to a nonpublic forum or as the denial of a government benefit." *Id.* at 92. As the court explained, such an "exclusion is constitutional if and only if it was (1) viewpoint neutral and (2) reasonable," *id.* (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985), and *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 550 (1983)), the same criteria that apply in limited public forum cases, *see Martinez*, 561 U.S. at 679.[18]

---

[18] Indeed, although *Wyman* involved restrictions on a non-public—not a limited public—forum, it still is relevant here. "[T]he 'limited public forum' [i]s a sub-category of the designated public forum, where the government 'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.'" *N.Y. Mag. v. Metro. Transp. Auth.*, 136 F.3d 123, 128 n.2 (2d Cir. 1998) (quoting *Travis v. Owego-Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir.1991)). But "[e]xclusions of speech [from limited public fora] are treated the same as exclusions [from] non-public fora." *Id.* That is, "[u]nder the limited public forum analysis, exclusion of uses need only be reasonable and viewpoint[ ]neutral to pass constitutional muster." *Id.* (alterations and citations omitted).

For all those reasons, this Court agrees with the defendants that all of the plaintiffs' claims should be analyzed using the standards for restricting speech in a limited public forum.

### B.    Limited Public Forum Analysis

"[I]n a limited public forum, [the] government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre."  *Tyler*, 74 F.4th at 61 (alterations in original) (quoting *Hotel Emps. & Rest. Emps. Union, Loc. 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545-46 (2d Cir. 2002)).  "For 'expressive uses not falling within the limited category for which the forum has been opened, restrictions need only be viewpoint neutral and reasonable.'"  *Id.* at 61-62 (quoting *Hotel Emps.*, 311 F.3d at 546); *see Martinez*, 561 U.S. at 679 (stating that government entities may "restrict[] . . . access to a limited public forum" only if those restrictions are both "reasonable and viewpoint neutral").  But strict scrutiny applies "to restrictions on speech that fall[] within the designated category for which the forum has been opened."  *Tyler*, 74 F.4th at 62 (quoting *Hotel Emps.*, 311 F.3d at 545).

The plaintiffs argue that even if all of their claims are analyzed using the standards for restricting speech in a limited public forum, strict scrutiny still applies because their "speech and association clearly falls within the boundaries of [the] Student Association's recognized student organization forum."  Docket Item 42 at 16; *see* Docket Item 43 at 26 (making the same argument).  They note that "[UB] Young Americans for Freedom has existed since [approximately] 2017"; since then, they say, it "has held regular meetings and events on campus to advance its views" and has been a

"recognized student organization under [UB's] and [the] Student Association's policies."[19]  Docket Item 42 at 16 (citing Docket Item 37 at ¶¶ 49-54; 71-74).  Therefore, they argue, because UB Young Americans for Freedom belongs within the forum, it cannot be restricted from the forum—or deprived of any of its benefits—unless the restriction survives strict scrutiny.  *Id.*

That argument fails for several reasons.  First, the mere fact that UB Young Americans for Freedom is a longstanding student group does not mean that it automatically is entitled to all the benefits of the Student Association's recognized student organization forum.[20]  The Student Association certainly may impose rules about the way student organizations must conduct themselves within the forum.[21]  *See*

---

[19] Except, apparently, for the one-month period during which it was "automatically derecognized" under the National Affiliation Ban.  *See* Docket Item 37 at ¶¶ 86, 104; *see also* Docket Item 46-1 at 22 (stating that "[UB] Young Americans for Freedom's speech and association falls within the bounds of [the] Student Association's forum" because Student Association "has recognized the group since 2017, except between its automatic derecognition and later re-recognition" (citations omitted)).

[20] Both sides agree that UB Young Americans for Freedom is a recognized student organization of the Student Association; they disagree about whether the group can be required to follow certain rules as a condition for full access to all the benefits of that status.  *Compare* Docket Item 37 at ¶¶ 104, 135-37, *and* Docket Item 46-1 at 22, *with* Docket Item 41-8 at 12, 23.  The analysis would be much the same if this dispute was about access to recognized student organization status; nonetheless, the Court notes that the relevant forum here is access to the benefits of the status, not the status itself.  *See Cornelius*, 473 U.S. at 801 (noting that "in defining the forum, [courts] focus[] on the access sought by the speaker").

[21] Throughout this section, the Court, like the parties, treats the Student Association's Legal Status Ban as a restriction on access to the forum.  But there is another—and perhaps simpler—way to think of the Legal Status Ban:  as a definition of the forum it is offering.  Viewed this way, the Student Association is not conditioning forum access on compliance with the Legal Status Ban; rather, it is defining the kind of status that it is offering, which is to be a group among groups in the Student Association without independent legal status.  In fact, that definition is precisely how the Legal Status Ban is written into the Student Association's by-laws.  *See* Docket Item 37-6 at 22-23.  Section 7.04(d) *defines* a "club" or "student organization" under the by-laws as

*Martinez*, 561 U.S. at 669-70 (upholding university program in which "[i]n exchange for

the[] benefits" of recognized student organization status, those organizations "must

abide by certain conditions"); *id.* at 684 ("[D]ecisions of th[e Supreme] Court have never

denied a university's authority to impose reasonable regulations compatible with [its

educational] mission upon the use of its campus and facilities." (quoting *Widmar v.*

*Vincent*, 454 U.S. 263, 267 n.5 (1981)); *Healy v. James*, 408 U.S. 169, 180 (1972)

─────────────

"a group of [m]embers of [the Student Association] acting as a group of [m]embers[,] each [of which] is part of" the Student Association rather than a "separate legal entity." *Id.* at 23.

    If the forum is understood in this way, then the plaintiffs' claims about the Legal Status Ban and the Acknowledgment Provision—if not their claims that certain other Student Association policies confer that body with "unbridled discretion"—necessarily fail.  A government entity is not required to widen the boundaries of a limited public forum beyond those it has set:  A town need not provide a space for public comment at the fire station on Friday merely because it opened such a space in the town hall on Monday.  *See Cornelius*, 473 U.S. at 799-800 ("Even protected speech is not equally permissible in all places and at all times.  Nothing in the Constitution requires the [g]overnment freely to grant access to all who wish to exercise their right to free speech on every type of [g]overnment property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."); *see also Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The [g]overnment can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way.").  The plaintiffs would like the Student Association to offer a forum in which each student club is accorded independent legal status.  *See* Docket Item 43 at 31-32; Docket Item 53 at 12.  But that does not mean that the Student Association is obliged to open one.

    Because neither side characterizes the forum this way, the Court does not rest its decision on these grounds.  And the Court recognizes that distinctions between the contours of a forum, on the one hand, and restrictions on access to that forum, on the other, are slippery and can easily be manipulated.  *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013) (noting in context of unconstitutional conditions discussion that the "line" between a restriction governing the limits of a funding program and an unconstitutional condition is not always "clear, in part because the definition of a particular program can always be manipulated to subsume the challenged condition").  But regardless, and for the reasons in this decision, the plaintiffs' claims still fail.

("[W]here state-operated educational institutions are involved, th[e Supreme] Court has long recognized 'the need for affirming the comprehensive authority of the [s]tates and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the school.'" (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969))).

Indeed, the Second Circuit has made clear that "government entities are permitted to restrict the form or manner of speech" in a limited public forum "even if [that] speech addresses the topic of agenda of th[e] forum," and "[s]uch restrictions . . . are not subject to strict scrutiny."  *Tyler*, 74 F.4th at 62-63 (upholding common council's prohibition on sign carrying during meeting even though "public comment" in both "verbal and written" forms was generally allowed); *cf. Endemann v. City of Oneida*, 2020 WL 1674255, at *5-6 (holding that city council could not "selectively deny" plaintiff from speaking at city council after permitting others to do so because his speech fell within the genre for which limited public forum had been opened).

Nor does the mere fact that UB Young Americans for Freedom has been a fully recognized student organization through the Student Association since 2017 with all the benefits of that status mean that it can never be excluded from that forum.  If an entity has been part of a forum without adhering to the forum's legitimate rules, or if the forum's rules change in a nondiscriminatory way and a member chooses not to comply with the new rules, the forum may exclude the noncompliant person or organization. *See Wyman*, 335 F.3d at 84-85, 98 (upholding state's removal of Boy Scouts of America from nonpublic forum in which organization had participated for more than

three decades after state determined organization was not complying with state nondiscrimination law, a condition for taking part in forum).

In this case, there is no dispute that the plaintiffs have refused to comply with both the Legal Status Ban and the Acknowledgment Provision.  *See* Docket Item 37 at ¶¶ 128-31.  Those are conditions of access to the Student Association's student organization forum—restrictions that a government may impose so long as they are "viewpoint neutral" and "reasonable."  The Court therefore addresses whether they are.

### 1.    Viewpoint neutrality

#### a.    Facial challenge

"As a general matter, viewpoint discrimination represents a particularly 'egregious' subset of content discrimination in which 'the government targets not subject matter but particular views taken by speakers on a subject.'"  *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 281 (2d Cir. 1997) (quoting *Rosenberger*, 515 U.S. at 831).  That is, while a restriction on access to a limited public forum may make distinctions based on "'subject matter' (content)," it may not single out "'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered' (viewpoint)."  *Id.* (quoting *Rosenberger*, 515 U.S. at 831).

Under the Legal Status Ban, "each club is a group of [m]embers of [the Student Association] acting as a group of [m]embers"; a club may not "be a separate legal entity from [the Student Association]," nor may it "have any accounts or financial activities outside [the Student Association]," "enter into contracts," "take legal actions," "commence litigation," or "undertake legal obligation."  Docket Item 37-6 at 23.  The

Acknowledgment Provision requires all club officers to certify compliance with those rules.  Docket Item 37 at ¶¶ 106-07, 128-29.

On their face, neither provision makes any distinction based on viewpoint.  In fact, both provisions apply to all clubs equally and without exception; both require that all organizations recognized by the Student Association—regardless of their nature, let alone their viewpoint—be structured in a particular way.  That is not even content discrimination, it certainly is not viewpoint discrimination.  *See Martinez*, 561 U.S. at 694-95 (holding that university's "all-comers requirement," which "dr[ew] no distinction between groups based on their message or perspective" but rather applied to "*all* student groups," was "textbook viewpoint neutral"); *Schain v. Schmidt*, 396 F. App'x 713, 714 (2d Cir. 2010) (summary order) (holding that university's regulations were "facially unobjectionable" because "they categorize[d] organizations receiving student funds by their organizational structure, rather than their ideological viewpoint").

The plaintiffs counter that "general applicability" does not mean "viewpoint neutrality."  Docket Item 43 at 27.  And perhaps that is so, but the plaintiffs do not and cannot argue that the Legal Status Ban or the Acknowledgment Provision singles out any particular viewpoint because they simply do not.

To be sure, as the Second Circuit explained in *Wyman*, "it is not enough that a law appear viewpoint[ ]neutral on its face."  335 F.3d at 93.  Instead, "[a] reviewing court must also determine that the rule is not a façade for viewpoint discrimination."  *Id.*; *see also Tyler*, 74 F.4th at 60 n.2 (noting that "the impetus for adopting the sign ban [challenged in the case] would speak to viewpoint discrimination" but that plaintiffs had "waived" that claim on appeal).  And here, the plaintiffs allege that both the National

Affiliation Ban and the Acknowledgment Provision that replaced it were passed in response to the plaintiffs' event with Michael Knowles. *See* Docket Item 37 at ¶¶ 73-79, 105-08, 119. But they do not allege that the Legal Status Ban—which is entirely viewpoint neutral as written—was implemented as "a façade" for viewpoint discrimination. *See generally id.* Nor does this Court see how it could be: It is undisputed that the Legal Status Ban was a part of the Student Association's by-laws before the events that led to this lawsuit. *See id.* at ¶¶ 105-08. And the plaintiffs do not allege any facts showing that the requirements of the Legal Status Ban or the Acknowledgment Provision have a "differential adverse impact on . . . groups" of a particular viewpoint.[22] *See Wyman*, 335 F.3d at 93.

The plaintiffs also argue that "[t]he unbridled discretion inherent in th[ese provisions] threatens all views and all student organizations." *Id.* And courts have considered whether a university's policy confers "unbridled discretion" in assessing its viewpoint neutrality. *See Amidon*, 508 F.3d at 102-105; *Southworth v. Bd. of Regents of Univ. of Wisconsin Sys.*, 307 F.3d 566, 575-92 (7th Cir. 2002) ("*Southworth II*"). But the Legal Status Ban and the Acknowledgment Provision do not—on their face—confer unbridled discretion; in fact, they do not confer *any* discretion at all. Docket Item 37-5 at

---

[22] Further, the Student Association offered evidence showing that the Legal Status Ban "has existed since 2015" and that UB Young Americans for Freedom operated under that provision since 2016. *See* Docket Item 52 at 8; Docket Item 41-1 at ¶ 15. While this Court cannot consider that evidence in this procedural posture—a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)—the plaintiffs have not disputed that the Legal Status Ban has been a part of the Student Association's by-laws since 2015; instead, they argue that it "is irrelevant because [the Student Association] was not enforcing them." Docket Item 53 at 6 (emphasis omitted). Any assertions about the way the provision was *enforced*, however, go to the plaintiffs' as-applied challenge against the Legal Status Ban and the Acknowledgment Provision, which this Court discusses below. *See infra* Section II.B.1.b.

5-7; Docket Item 37-6 at 23-24.  On the contrary, the provisions apply to all Student

Association clubs and club officers without exception.  Docket Item 37-5 at 5-7; Docket

Item 37-6 at 23-24.

The plaintiffs insist otherwise.  *See* Docket Item 43 at 27.  But the second

amended complaint includes nothing suggesting that either the Legal Status Ban or the

Acknowledgment Provision allow for any discretion—nor could it, given the plain

language of those provisions.  *See* Docket Item 37.

The plaintiffs also allege that *other* Student Association policies allow for

"unbridled discretion" and impute that discretion to the Legal Status Ban.  *See* Docket

Item 37 at ¶¶ 143-46, 150-159, 173-76.  Their logic seems to be that because the Legal

Status Ban bars all clubs from having legal status and entering into contracts or certain

other activities themselves, the clubs must ask the Student Association to do so on their

behalf and that the policies governing the approval of those requests confer the Student

Association with "unbridled discretion."  *See id.*  But while such allegations may state a

claim that those other Student Association policies give the Student Association

"unbridled discretion," that does not mean that the Legal Status Ban itself confers such

discretion.  Instead, the Legal Status Ban is—as the plaintiffs themselves call it—a

blanket "ban."  *See id.* at ¶¶ 7-8, 75-78.

The Legal Status Ban and the Acknowledgment Provision therefore are viewpoint

neutral on their face.

### b.    As-applied challenge

The fact that a policy is facially neutral does not rule out the possibility that it has

been applied in a discriminatory manner.  *Cf. Wyman*, 335 F.3d at 95.  But the second

amended complaint is devoid of any allegation that the Student Association has not

enforced the Legal Status Ban or the Acknowledgment Provision against other clubs or that any club has been able to engage in any of the prohibited activities. *See generally* Docket Item 37. Instead, the plaintiffs argue that because they "cannot sign the form certifying that they are complying with the Legal Status Ban" as required by the Student Association under the Acknowledgment Provision, they have been unable to "access the funds allocated to UB Young Americans for Freedom . . . since the beginning of the 2023-2024 academic year." *Id.* at ¶¶ 129-131, 135. And they say that they "attempted to add language to the form that would allow them to sign it without certifying as true something that was false" but that the "Student Association rejected this effort, insisting that [the p]laintiffs sign the form without alteration." *Id.* at ¶¶ 132-33.

Those allegations show only that the plaintiffs have been barred from accessing their funds based on their failure to comply with the viewpoint-neutral Student Association policies. They do not show that UB Young Americans for Freedom has been treated *differently* from any other group. For example, the plaintiffs do not allege that the Student Association has allowed other groups to access student activity funds without signing the required acknowledgment form or that other groups have been allowed to alter the language of the form.[23] *See generally id.*

---

[23] The plaintiffs argue that it would be premature to grant the defendants' motions to dismiss their as-applied claims at this juncture because "[d]iscovery may reveal more examples of disparate treatment." Docket Item 43 at 30-31. Indeed, they say, their as-applied claims "should [not] be dismissed because [the plaintiffs do not] know all the information in [the] Student Association's archives." *Id.* at 31. Discovery, however, "is authorized solely for parties to develop the facts in a lawsuit in which [the] plaintiff[s] ha[ve] stated a legally cognizable claim"—"not . . . to permit [the] plaintiff[s] to find out whether [they] ha[ve] such a claim." *Sibley v. Watches*, 501 F. Supp. 3d 210, 231 n.8 (W.D.N.Y. 2020) (citations omitted); *see also Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (holding that district court did not err in dismissing defamation claims without allowing discovery as to the defendants' actual malice because "a . . . plaintiff must

In sum, the Court finds that the Legal Status Ban and the Acknowledgment Provision are viewpoint neutral both on their face and as applied.

### 2.    Reasonableness

"In a limited public forum, the reasonableness analysis turns on the particular purpose and characteristics of the forum and the extent to which the restrictions on speech are 'reasonably related' to maintaining the environment the government intended to create in that forum."  *Tyler*, 74 F.4th at 63 (quoting *Hotel Emps*., 311 F.3d at 554); *see Martinez*, 561 at 685 (assessing reasonableness of university policy required "taking into account the [registered student organization] forum's function and 'all the surrounding circumstances'" (quoting *Cornelius*, 473 U.S. at 809)).  Here, this "inquiry is shaped by the educational context in which it arises."  *See Martinez*, 561 U.S. at 685

"'[T]o survive First Amendment scrutiny[,] the restriction need not be the most reasonable or the only reasonable limitation imaginable,' but simply 'consistent with the government's legitimate interest in preserving the property for the use to which it is lawfully dedicated.'"  *Tyler*, 74 F.4th at 63 (alterations in original) (internal citations omitted) (first quoting *Byrne v. Rutledge*, 623 F.3d 46, 59 (2d Cir. 2010); and then quoting *Hotel Emps*., 311 F.3d at 554).  "Significantly, the existence of 'alternative

---

plead 'plausible grounds' to infer [such] malice by alleging 'enough facts to raise a reasonable expectation that discovery will reveal evidence of' actual malice" (alteration omitted) (quoting *Twombly*, 550 U.S. at 556)).  Because the plaintiffs have not offered any allegation suggesting that that any other group has been treated differently—much less any allegation that any group with a different viewpoint has been treated differently—the plaintiffs are not entitled to discovery on their claim that the Legal Status Ban and the Acknowledgment Provision violated the First Amendment as applied to them.

channels' of communication is a relevant factor in assessing the reasonableness of a restriction on speech in a limited public forum." *Id.* (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 53 (1983)). "[C]ourts can take notice of government interests that "ring of common[ ]sense," even at the motion to dismiss stage. *See Tyler*, 74 F.4th at 64 (alteration omitted) (quoting *Hotel Emps.*, 311 F.3d at 554).

The UB administrators argue that "the funding and audit requirements" of N.Y. Comp. Codes R. & Regs. tit. 8, § 302.14—which governs a university's collection of student activity fees—"provide a reasonable justification for structuring student organizations in a manner that avoids the potential for financial irregularities and facilitates prompt review of the expenditure of UB student activity fees." Docket Item 40-1 at 12. Along the same lines, the Student Association says that the "limitations [imposed] ensure fiscal integrity and compliance with UB and SUNY policies, protect the student activity fee, and limit [the Student Association's] liability." Docket Item 41-8 at 26. Moreover, Regulation No. 7 itself—which repealed the National Affiliation Ban and adopted the Acknowledgment Provision—explicitly referred to many of those goals. Docket Item 37-5 at 5; *see* Docket Item 41-8 at 26. For example, Regulation No. 7 noted that the Student Association's rules, including the Legal Status Ban and the Acknowledgment Provision, are intended to "protect students and their student activity fees" as well as to "ensure fair and active participation in [Student Association] clubs and student activities, which are meant to enrich the[ students'] college experience." Docket Item 37-5 at 5; *see* Docket Item 41-8 at 26.

Those interests clearly "ring of common[ ]sense." *See Tyler*, 74 F.4th at 64 (alteration omitted). The parties agree that the purpose of the forum is to facilitate

students' extracurricular development, including their "intellectual and social development" as well as their "expression."  *See* Docket Item 41-8 at 25 (stating that Student Association's student organization forum "ensures that the opportunities for intellectual and social development through extracurricular activities are available to all students"); Docket Item 43 at 31 (noting that the parties agree on this point).  The Legal Status Ban is aimed at safeguarding the limited resources available toward that end and ensuring that funds are used for the purpose they are meant: UB student life.  *See* Docket Item 40-1 at 12; Docket Item 41-8 at 26.  It does that by centralizing both the management of the student activity fund and the associated legal obligations; the Acknowledgment Provision, in turn, helps ensure awareness of and compliance with the Legal Status Ban.  Docket Item 41-1 at 12; Docket Item 41-8 at 26; Docket Item 37 at ¶ 107; Docket Item 37-5.  Courts have recognized that a university may reasonably restrict access to a limited public forum based on "manageability or the lack of resources."  *See Viewpoint Neutrality Now! v. Regents of Univ. of Minnesota*, 516 F. Supp. 3d 904, 920 (D. Minn. 2021) (quoting *Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 337 (8th Cir. 2011)); *id.* at 930 (holding that requirement that university club provide certain financial documentation before being eligible for recognized student organization status was "reasonable" because "it ensure[d] that [recognized student organizations] have demonstrated fiscal responsibility before receiving funds"); *cf. Perry Educ. Ass'n*, 460 U.S. at 50-51 (school board policy allowing union representing all district's teachers, but not rival union, access to "school mail facilities" was "reasonable" because it "enable[d official union] to perform effectively its obligations as exclusive representative of *all* [district] teachers").

The plaintiffs argue that because these policies actually "impede student speech and association," they necessarily do not fulfill the forum's purpose of "facilitating speech" and are patently unreasonable.[24]  Docket Item 43 at 32.  But the Supreme Court has not taken such a blinkered view of what it means for a university to "facilitate student speech."

In *Southworth I*, for example, the Court held that "recognition must be given . . . to the important and substantial purposes of [a u]niversity, which seeks to facilitate a wide range of speech."  529 U.S. at 231.  The Court explained that a "[u]niversity may

---

[24] The plaintiffs also contend that the policies here are unreasonable because the Legal Status Ban is "ultra vires" under New York law.  Docket Item 37 at ¶ 215 (italics omitted).  More specifically, they say that UB Young Americans for Freedom is an "unincorporated association" under section 13 of New York State's General Associations Law because the group has a "president" and a "treasurer."  Docket Item 37 at ¶ 122 (citing N.Y. Gen. Ass'ns Law § 13).  And they say that section 12 of the same law "provides that unincorporated associations may maintain legal actions to vindicate their rights by and through the association's president or treasurer."  *Id.* at ¶ 123 (citing N.Y. Gen. Ass'ns Law § 12).

This argument fails for at least two reasons.  First, it is not clear that UB Young Americans for Freedom is an unincorporated association, notwithstanding its president and treasurer, since under the Legal Status Ban, it is a part of the Student Association, a "non-profit membership corporation."  *See* Docket Item 37 at ¶ 33.  Further, as a court in the Northern District of New York has noted, section 12 does not confer "legal existence" upon any "unincorporated association."  *Young Am.'s Found. v. Stenger*, 2023 WL 3559619, at *19 (N.D.N.Y. May 19, 2023).  Such an argument, the court explained, "confuses the concept of legal existence . . . with a procedural mechanism allowing, under certain circumstances, an unincorporated group of individuals to maintain one suit to pursue claims that they otherwise could have pursued individually." *Id.*  Section 12 merely "authorizes a president or treasurer of an unincorporated association of individuals to bring suit to recover *on behalf of the individuals* who 'by reason of their interest or ownership' in the cause of action or commonly held property could have maintained suits in their individual names."  *Id.* (quoting N.Y. Gen. Ass'ns Law § 12).  It does not "vest[] unincorporated associations under New York law with legal personhood, capable of recovering on their own behalf, independent of their individual members."  *Id.*  So the Legal Status Ban is not inconsistent with New York law and is not unreasonable on that basis.

determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall." *Id.* at 233. And "[i]f [a u]niversity reaches this conclusion, it is entitled to impose a mandatory fee to sustain an open dialogue to these ends"—even if that fee imposes certain burdens upon students who disagree with some of the speech that is facilitated. *See id.* at 232-33.

The same is true by analogy here. The Legal Status Ban may not maximize the independence of each student club, but that does not make it unreasonable. The university is entitled to impose restrictions that reasonably protect its student funds, even if those restrictions affect the independence of the funded student organizations. And it also is entitled to "determine that its [speech-facilitating] mission is well served" by creating a forum in which disparate speakers must coexist. *See Southworth I*, 529 U.S. at 233. Again, the test is not whether the restriction here is "the most reasonable or the only reasonable limitation" but whether it is reasonable. *Hotel Emps.*, 311 F.3d at 554 (citation omitted). And here, it is.

Finally, the "alternative channels of communication[]" available to the plaintiffs only buttress this Court's conclusion that the restrictions here are reasonable. *See id.* at 545 (citation omitted); *see also Martinez*, 561 U.S. at 690 (holding that university's policy was "all the more creditworthy [and reasonable] in view of the 'substantial alternative channels that remain open for [the plaintiff student group's] communication to take place'" (quoting *Perry Educ. Ass'n*, 460 U.S. at 53)). In *Martinez*, the Court held that "alternative channels" existed because "[a]lthough CLS could not take advantage of" certain communication methods available only to registered student groups, it

remained able to use "school facilities to conduct meetings" as well as "chalkboards and generally available bulletin boards to advertise events."  561 U.S. at 690.  The alternative channels are even more "substantial" here.  *See id.*  While the plaintiffs must comply with the Student Association's rules in order to be a recognized student organization under the Student Association specifically, they may achieve recognized student organization status through a number of other departments and entities without having to comply with the challenged restrictions.  *See* Docket Item 37 at ¶¶ 64-65.

In sum, under limited public forum analysis, the Legal Status Ban and the Acknowledgment Provision are both viewpoint neutral and reasonable and thus do not violate the plaintiffs' First Amendment rights, either on their face or as applied.  If the day comes when the Student Association acts in a way that discriminates against UB Young Americans for Freedom based on viewpoint, the plaintiffs may bring an as-applied challenge.  Or if the Student Association promulgates policies that are unreasonable or do not apply across the board, they may bring a challenge on the face of those policies.  But based on the plain language of the challenged policies and the pleadings, the plaintiffs have not raised a viable facial or as-applied claim here.

### 3.     Alternative standards of review

As discussed above, the plaintiffs' claims are properly analyzed under the rules governing limited public fora.  *See supra* Section II.A.2.  But even if this Court agreed with the plaintiffs that their expressive association or compelled speech claims[25] should

---

[25] As discussed above, the plaintiffs also claim that the Legal Status Ban and the Acknowledgment Provision impose "unconstitutional conditions."  *See* Docket Item 37 at ¶¶ 281-97.  But as the plaintiffs themselves state in their response to the Student Association's motion to dismiss, many of the Supreme Court's unconstitutional conditions cases—including *Rust v. Sullivan*, 500 U.S. 173, and *FCC v. League of*

be analyzed separately according to other lines of precedent from outside the limited public forum context, their claims still would fail.

a.    Expressive association

"[T]he Supreme Court [has] set forth a three-part inquiry for evaluating expressive association claims." *Slattery*, 61 F.4th at 287 (citing *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)). Courts consider: (1) "whether the group making the claim engaged in expressive association"; (2) "whether the state action at issue significantly affected the group's ability to advocate its viewpoints"; and (3) after "weigh[ing] the state's interest implicated in its action against the burden imposed on the associational expression[, whether] . . . the state interest justified the burden." *Id.* (citation omitted). "If [the court] determine[s] that the state action imposes 'severe burdens on associational rights' at the second step, [it] appl[ies] 'strict scrutiny, in which case the restriction survives only if it is narrowly drawn to advance a compelling state interest,' at

_____

*Women Voters of Cal.*, 468 U.S. 364 (1984)—"don't apply to student fee fora." Docket Item 43 at 33; *Southworth I*, 529 U.S. at 234-35 (explaining that cases like *Rust* and *FCC*—which involved government speech—were not applicable where a state entity was creating a forum aimed at funding student speech rather than its own). The plaintiffs apparently root their unconstitutional conditions claim in another, non-subsidy case, *Perry v. Sindermann*, 408 U.S. 593 (1972). *See* Docket Item 37 at ¶ 282. But that case involved facts quite different from those here. More specifically, a professor alleged that his contract was not renewed based on his exercise of free speech. *See Sindermann*, 408 U.S. at 595. Not renewing an employment contract is quite different from requiring a student organization to comply with rules connected to receiving student funds. In *Rust*, in fact, the Supreme Court distinguished between the "den[ial of] a benefit" and requirements imposed on a government program to ensure "that public funds [are] spent for the purposes for which they were authorized." 500 U.S. at 196. Although *Rust* involved a government subsidy program different from the student activity fund program at issue here, *see id.* at 178-79, it is clear that a public university is free to impose viewpoint-neutral, reasonable limits on access to a student activity fund program, *see Martinez*, 561 U.S. at 685-97. For that reason, the plaintiffs have failed to state a claim that either the Legal Status Ban or the Acknowledgment Provision imposes an unconstitutional condition. *See also Wyman*, 335 F.3d at 92.

the third step." *Id.* (quoting *Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct.*, 852 F.3d 178, 191 (2d Cir. 2017)).

The Court assumes that UB Young Americans for Freedom and its members are "engaged in expressive association." *Id.*; *see* Docket Item 37. It is less clear, however, that the Legal Status Ban and the Acknowledgment Provision "significantly affect[] the group's ability to advocate its viewpoints." *See Slattery*, 61 F.4th at 287. The plaintiffs cite cases—*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007); and *Slattery v. Hochul*, 61 F.4th 278, 283—for the proposition that "[t]he government unconstitutionally burdens the right of association when it 'seeks to impose penalties or withhold benefits from individuals because of their membership in a disfavored group,' or when it 'forces the group to accept members it does not desire.'"[26] Docket Item 43 at 23 (internal citation omitted) (quoting *Roberts*, 468 U.S. at 622-23). That bar is met here, the plaintiffs say, because the Legal Status Ban "compels all groups to merge into [the] Student Association (and thus with each other)"; likewise, they say it burdens their "[]ability to own property, raise funds, sign contracts, etc.," and thereby impedes their ability to affiliate with organizations with which they do want to associate. *Id.* at 23-24. Those burdens, they argue, "easily qualify as 'severe,'" *id.* at 23 (quoting *Slattery*, 61 F.4th at 287), "'direct and substantial,' and 'significant,'" *id.* at 23 (quoting *Tabbaa*, 509 F.3d at 101).

---

[26] The plaintiffs are correct that state action requiring groups to "accept members" implicates the right of expressive association. *See Roberts*, 468 U.S. at 622-23. As explained below, however, this right is not "absolute": In fact, in *Roberts*, the case quoted by the plaintiffs here, the Supreme Court upheld a state law that required the plaintiff organization to accept women as members. 468 U.S. at 623; *see infra*.

This Court disagrees.  In the first place, the notion that the Legal Status Ban "merges" various "disparate [student] organizations into one, forcing them and their members to associate together and preventing any of them from maintaining separate and independent existence," Docket Item 37 at ¶ 189, is at best an overstatement. While this Court is bound to accept all facts in the complaint as true at this stage of the litigation, the plaintiffs plead no facts showing that the groups are in any way "merge[d]" in the ordinary sense of the word—such as by having to share meetings, events, or even a budget.  *See generally id.*  So there are no facts supporting that conclusory assertion.

What is more, the plaintiffs' claim apparently is based on their own interpretation of the Legal Status Ban, and this Court is not bound to accept that legal interpretation. Nor does it.

In fact, the Legal Status Ban does not say that all groups recognized by the Student Association are "merge[d]."  *Id.* at ¶ 189.  Instead, it says that "[a] club is a group of [m]embers of [the Student Association] acting as a group of [m]embers"; that "each club is part of [the Student Association]"; and that "[n]o club shall be a separate legal entity."  *Id.* at ¶ 109.  As an analogy, a state is a group of citizens of the United States acting as a group, and each state is a part of the United States.[27]  But no one would claim that Vermont has merged with Texas.

---

[27] Likewise, no state has the status of a nation on the international stage.  In fact: "No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."  U.S. Const. art. I, § 10.

And even setting all that aside, the facts here are easily distinguishable from the cases that the plaintiffs cite. For one thing, those cases involved far more direct impositions on associational freedoms than those at issue here.

In *Roberts*, for example, a private all-men's organization, the U.S. Jaycees, alleged that the Minnesota Human Rights Act violated the First Amendment as applied by requiring it to "admit women as full voting members." *Roberts*, 468 U.S. at 612. The Supreme Court agreed that the law "infringe[d]" upon the organization's associational rights, stating that "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire." *Id.* at 623. "Such a regulation," the Court explained, "may impair the ability of the original members to express only those views that brought them together." *Id.*; *see also Dale*, 530 U.S. at 644 (holding that New Jersey could not require, under its public accommodations law, the Boy Scouts of America to readmit adult member the organization had expelled based on his sexual orientation and "gay rights activis[m]"). The Court nonetheless upheld the law, finding that "Minnesota's compelling interest in eradicating discrimination against its female citizens justifie[d] the impact that application of the statute to the Jaycees m[ight] have on the male members' associational freedoms." *Roberts*, 468 U.S. at 623-29.

Somewhat similarly, *Slattery* involved a New York State law prohibiting "employer[s]" from "discriminat[ing]" or "tak[ing] any retaliatory personnel action against an employee . . . on the basis of the employee's or dependent's reproductive health decision making." 61 F.4th at 283 (citation omitted). The Second Circuit held that a

"pro-life" pregnancy center had stated a "plausible claim that the . . . law unconstitutionally burdens its right to expressive association." *Id.* at 283-84.

In other words, each of those cases involved the direct regulation of association: The organizations in *Roberts* and *Slattery* had no choice but to comply with the state nondiscrimination law or cease to exist.[28]

But that is not the case here. The Legal Status Ban and the Acknowledgment Provision do not directly regulate association, and UB Young Americans for Freedom need not choose between honoring those provisions and ceasing to exist. In fact, UB Young Americans for Freedom is subject to the Student Association's by-laws, including the Legal Status Ban, only to the extent that it wishes to be recognized by the Student Association. Moreover, the plaintiffs do not even have to choose between being a *recognized* student group and complying with the Student Association's rules: It is undisputed that there are other ways to gain recognized status. *See* Docket Item 37 at ¶¶ 61-64; Docket Item 40-1 at 7; Docket Item 41-8 at 27.

To be sure, only groups recognized by the Student Association have access to the mandatory student activity fee. Docket Item 37 at ¶ 64. But withholding that potential "carrot" does not turn the Legal Status Ban into the kind of direct restriction on

---

[28] *Tabbaa*, which the plaintiffs also cite, Docket Item 43 at 23, involved an entirely different sort of claim and is likewise inapposite: "[F]ive U.S. citizens and practicing Muslims with no criminal records and of whom the government had no individualized suspicion of being associated with terrorism" were "detained by [U.S.] officials for several hours" based on their "attend[ance of an] Islamic conference[]." *Tabbaa*, 509 F.3d at 92. The court held that "the burden on [the] plaintiffs' associational rights was sufficiently 'significant' to implicate the protections of the First Amendment," although it found that the government's interest was sufficiently "compelling" to justify that burden. *Id.* at 102-03, 105 (quoting *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996)). The plaintiffs here are not subject to any government search or detention—or anything even remotely similar—based on their associations.

association that courts have deemed constitutionally suspect. *See Martinez*, 561 U.S. at 683. And while the Supreme Court has held that "the freedom of expressive association protects more than just a group's membership decisions," it also has held that laws that merely require some degree of association are not necessarily unconstitutional. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 69-70 (2006).

*Rumsfeld* is instructive in this regard. There, the Supreme Court considered a challenge to a federal law providing that "an institution of higher education [that] denies military recruiters access equal to that provided other recruiters . . . lose[s] certain federal funds." *See id.* at 51. That statute did not violate the associational rights of a group of law schools that objected to the military's discrimination on the basis of sexual orientation, the Court held. *See id.* at 52, 69-70. Distinguishing the law at issue from those that regulated "membership decisions" or otherwise "affect[ed] the group's ability to express its message," the Court noted that the law schools' "[s]tudents and faculty [remained] free to associate [in order] to voice their disapproval of the military's message." *Id.* at 69-70. Therefore, it explained, "[a] military recruiter's mere presence on campus does not violate a law school's right to associate, regardless of how repugnant the law school considers the recruiter's message." *Id.* at 70.

Parallel logic applies here: Nothing in the Legal Status Ban prevents UB Young Americans for Freedom from voicing its strenuous disagreement with—indeed, condemnation of—other groups in the student organization forum. And the mere presence of other clubs in the student organization forum—a forum that UB Young

Americans for Freedom may opt out of if it wants—does not violate the plaintiffs' right of expressive association.[29]

> b.    *Compelled speech*

The plaintiffs' assertion that the Legal Status Ban and the Acknowledgment Provision compel speech fare no better. *See* Docket Item 37 at ¶¶ 234-44; Docket Item 43 at 24-26.

Without a doubt, "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633-34 (1943)). In fact, the Supreme Court has recognized that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind." *Id.* (internal quotation marks omitted) (citing *Barnette*, 319 U.S. at 637); *see also New Hope*, 966 F.3d at 170 (explaining that under the First Amendment, "[the] government . . . cannot tell people that there are things 'they must say'" (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013)). "Thus, when [the] government 'direct[ly] regulat[es] . . . speech' by mandating that persons explicitly agree with government policy on a particular matter, it 'plainly violate[s] the First Amendment.'" *New Hope*, 966 F.3d at 170 (alterations in original) (quoting *Agency for Int'l Dev.*, 570 U.S. at 213).

---

[29] Indeed, for some six years prior to March 2023, the plaintiffs apparently were able to express their message as a group recognized by the Student Association without any alleged hindrance. *See* Docket Item 37 at ¶¶ 23-27, 71-72, 107-09; *see also supra* note 22.

The plaintiffs say that the Legal Status Ban violates those principles by "compel[ling them] to associate with organizations, individuals, and expression [with which] they do not wish to associate . . . and that speak messages [with which] they disagree."  Docket Item 37 at ¶ 239.  Because the "Legal Status Ban merges all student organizations into the Student Association," they say, "any message communicated by any student organization is equally attributable to UB Young Americans for Freedom, including messages with which it disagrees or would prefer not to express."  *Id.* at ¶ 240.

But nothing in the Legal Status Ban or the Acknowledgment Provision compels the plaintiffs to say anything.  For one thing, the plaintiffs' argument to the contrary is rooted in their contention that the Legal Status Ban "merges" all student groups, a legal conclusion that this Court already has rejected.  *See supra* Section II.B.3.a.  After all, no one reasonably can believe that simply because the College Republicans and the College Democrats are both members of a university's student association, what one says the other says too.  And if the plaintiffs disagree with what another organization in the Student Association says, they can shout that from the rooftops, print and distribute flyers, or fill the internet with their contrary thoughts.

Again, the cases on which the plaintiffs rely are inapposite because they involved regulations far more direct than these ones.  *See 303 Creative*, 600 U.S. at 587-92 (Colorado could not require website and graphic design company to create wedding websites for gay couples under antidiscrimination law); *Janus*, 585 U.S. at 884-86 (Illinois could not require "public employees . . . to subsidize a union . . . they cho[]se not to join"); *Barnette*, 319 U.S. at 626-29, 642 (school board could not require students to

"pledge allegiance to the [f]lag" in contravention of their religious beliefs); *Wooley*, 430 U.S. at 715-17 (New Hampshire could not require "[a]s a condition to driving an automobile"—"a virtual necessity for most Americans"—that plaintiffs display a license plate with a message with which they disagreed); *New Hope*, 966 F.3d at 148-49, 171-78 (adoption agency stated viable claim that New York regulation requiring it to serve prospective parents regardless of marital status or sexual orientation violated their First Amendment rights). Unlike the plaintiffs in those cases, UB Young Americans for Freedom must associate with the Student Association and allegedly be compelled to speak against its will only if it *wants* to associate with the Student Association—that is, if it chooses to be a student group recognized by the Student Association.

Moreover, as in the expressive association context, in assessing compelled speech claims, the Supreme Court has considered whether state action impaired a plaintiff's ability to convey a message; in that context, it has found that requiring a party to accommodate a message does not necessarily compel speech. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2400-01 (2024) (state action requiring "a party to provide a forum for someone else's views implicates the First Amendment . . . only if[] the regulated party is engaged in its own expressive activity[ that] the mandated access would alter or disrupt"). That is, whether accommodating a message compels speech depends on whether "the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld*, 547 U.S. at 63.

In *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), for example, the Court held that a state could require a "privately owned shopping center to which the public is invited" to allow "individuals to exercise [their] free speech and petition rights

on the [shopping center's] property." *Id.* at 76-77, 88.  The Court specifically

distinguished the case from its compelled speech cases, noting that the state

requirement did not impinge on the shopping center's ability to display any particular

message it wanted to.  *See id.* at 86-88.  As the Court explained,

> [m]ost important, the shopping center by choice of its owner is not limited to
> the personal use of [its owners].  It is instead a business establishment that
> is open to [members of] the public to come and go as they please.  The
> views expressed by members of the public in passing out pamphlets or
> seeking signatures for a petition thus will not likely be identified with those
> of the owner.

*Id.* at 87.  Indeed, the Court noted, the shopping center owner could "expressly disavow

any connection with the message by simply posting signs in the area where the

speakers or handbillers stand."  *Id.*

In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S.

557 (1995), on the other hand, the Court held that Massachusetts could not require a

private organization to include a group of "gay, lesbian, and bisexual descendants of . . .

Irish immigrants" in its annual St. Patrick's Day Parade.  *Id.* at 559-62.  The Court held

that the parade was "expressive" activity and that the organization's "claim to the benefit

of . . . autonomy to control [its] own speech [was] sound."  *Id.* at 574.  "Rather like a

composer," the Court wrote, "the [organization] selects the expressive units of the

parade from potential participants, and though the score may not produce a

particularized message, each contingent's expression in the [organization's] eyes

comports with what merits celebration on that day."  *Id.*  Thus, requiring the organization

to include marchers communicating a message with which it disagreed violated its First

Amendment rights by compelling speech.  *Id.* at 81.

The plaintiffs attempt to analogize the facts here to those in *Hurley*, arguing that "[t]he Legal Status Ban effectively conscripts every student club to march in the same parade, and that compulsion 'is enough to invoke [the plaintiffs'] rights as . . . private speaker[s] to shape their expression by speaking on one subject while remaining silent on another.'"  Docket Item 53 at 13 (alterations omitted) (quoting *Hurley*, 515 U.S. at 574).  But the context here is far more like a shopping center than a parade:  A campus passerby—or someone reading a club's literature—would be unlikely to attribute one club's messages to another club simply because both clubs were members of the same Student Association.[30]  *Cf. Southworth I*, 529 U.S. at 220-21, 232 (recognizing that in a university program "designed to facilitate extracurricular student speech" through the dissemination of a student activity fee, it "is all but inevitable" that some students will object to speech funded by subsidies from activity fees that they paid).  The plaintiffs do not allege, as in *Hurley*, that the Legal Status Ban prevents them from "select[ing] . . . expressive units" so as to produce a kind of "score."  Docket Item 37 at ¶¶ 234-44; *Hurley*, 515 U.S. at 574; *see Moody*, 144 S. Ct. at 2400 (stating that "expressive activity includes presenting a curated compilation of speech originally created by others").  Instead, the plaintiffs say that the rules of a forum they have chosen to join mean that merely sharing the forum compels them to speak.  *See, e.g.*, Docket Item 37 at ¶ 237,

---

[30] In fact, the connection is arguably more attenuated here than in *PruneYard*.  In that case, the speakers were on the shopping center owner's own property.  447 U.S. at 76.  Here, the only connection between the plaintiffs and the speech with which they disagree is common membership in a student forum.  *See* Docket Item 37.  And if UB Young Americans for Freedom wants to make it clear that it does not share the views of other Student Association clubs generally—or that it rejects another club's specific message—it can say so on its website or with placards on its offices or by passing out literature.  In other words, as in *PruneYard*, it can "simply post[] signs in the area where the speakers or handbillers stand."  *See PruneYard*, 447 U.S. at 87.

240.  And for the reasons explained, that is not enough to state a compelled speech claim.

In sum, the plaintiffs have failed to state a claim based on the Legal Status Ban or the Acknowledgment Provision, either on their face or as applied.  The defendants' motions to dismiss therefore are granted with respect to those claims, and the plaintiffs' motion for a preliminary injunction prohibiting the defendants from enforcing the Legal Status Ban therefore is denied.

## III.   CLAIMS BASED ON OTHER STUDENT ASSOCIATION POLICIES

Finally, the plaintiffs assert claims in connection with several other Student Association policies that they say confer "unbridled discretion" upon the Student Association to decide whether or not (1) to recognize a club; (2) to approve a club's contract, including a contract with an off-campus entity; (3) to allow a group to conduct a fundraiser or a financial transaction; and (4) to maintain resources purchased with Student Association funds.  *See* Docket Item 37 at ¶¶ 110-13, 143-73, 177-80, 262-65; Docket Item 43 at 28.

It is well established that "[w]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."  *Field Day*, 463 F.3d at 176 (quoting *City of Lakewood*, 486 U.S. at 755-56).  In *Southworth II*, the Seventh Circuit held that a university policy that conferred decisionmakers with "unbridled discretion" to distribute a student activity fee would violate the "viewpoint neutrality" requirement and thus be

unconstitutional.[31]  307 F.3d at 578-80.  Here, the plaintiffs say that the Student

Association's alleged "unbridled discretion" to make other decisions with respect to

student organizations is likewise unconstitutional.  Docket Item 37; *see Viewpoint*

*Neutrality Now!*, 516 F. Supp. 3d at 920-21.

It is not clear, however, that the plaintiffs have standing to challenge the Student

Association's policies relating to contracts, fundraising, and property.  As explained

above in somewhat greater detail:

> To establish Article III standing, "a plaintiff must show (1) it has suffered an
> injury in fact that is (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to
> the challenged action of the defendant; and (3) it is likely, as opposed to
> merely speculative, that the injury will be redressed by a favorable decision."

*Mhany Mgmt.*, 819 F.3d at 600 (some internal quotation marks omitted) (quoting

*Laidlaw*, 528 U.S. at 180-81).

"[B]road 'latitude [is] given facial challenges in the First Amendment context.'"

*Covenant Media of S.C., LLC v. City of North Charleston*, 493 F.3d 421, 429-30 (4th Cir.

2007) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007)).  "[I]t is well established

that one has standing to challenge a statute on the ground that it delegates overly broad

licensing discretion to an administrative office whether or not [the] conduct could be

proscribed by a properly drawn statute, and whether or not [the individual] applied for a

license."  *Southworth II*, 307 F.3d at 575 (emphasis omitted) (quoting *Freedman v.*

*Maryland*, 380 U.S. 51, 56 (1965)).  Nonetheless, "plaintiff[s] must establish that [they]

ha[ve] standing to challenge each provision of an ordinance by showing that [they were]

---

[31] The Seventh Circuit nonetheless concluded that the system for allocating
student activity fees did not confer decisionmakers with "unbridled discretion."
*Southworth II*, 307 F.3d at 595.

injured"—or are threatened with injury—"by application of those provisions."  *See Covenant Media*, 493 F.3d at 429-30 (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230 (1990)).  A plaintiff whose license was—or would be—denied on grounds that are clearly constitutional lacks standing to challenge other provisions of the licensing scheme.  *See id.*

In *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886 (9th Cir. 2007), a company challenged both "size and height restrictions" and an "off-site sign" restriction of a licensing scheme; the Ninth Circuit found that the first of those provisions was constitutional.  *Id.* at 890, 894.  As result of that holding—and because "neither [the company's] filings nor its actions in th[at] case . . . evinced any intent to file permit applications that comply with the[ size and height] requirements"—the court held that the company lacked standing to challenge the off-site sign restrictions.  *Id.* at 895.  In other words, because "[n]o change in the permit procedure would result in the approval of the permits," the court could not provide any redress to the injury the company had allegedly suffered under the off-site sign ban.  *Id.*; *see also Covenant Media*, 493 F.3d at 430 (holding that "[b]ecause [the plaintiff's] application violated the spacing requirement, it could not have been approved regardless of whether other substantive provisions of the [s]ign [r]egulation [we]re held to be unconstitutional"; thus, the plaintiff "could not have suffered any substantive constitutional injury due to other provisions of the [s]ign [r]egulation that may have been unconstitutional"); *Advantage Media, LLC v. City of Eden Prairie*, 456 F.3d 793, 801-02 (8th Cir. 2006) (holding that because "a favorable decision for [the plaintiff] even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its

proposed signs, [because] th[o]se would still violate other unchallenged provisions of the sign code [such as] the restrictions on size, height, location, and setback," the plaintiff lacked standing to "challenge any part of the sign code as overbroad").

Under the Acknowledgment Provision, "prior to taking any act as a[ Student Association] club officer—including but not limited to the use of [Student Association] club funds, facilities, or other resources—a student officer of a[ Student Association] club must sign" a form certifying compliance with the Student Association's Legal Status Ban. Docket Item 37 at ¶¶ 106-07. In this case, the plaintiffs—UB Young Americans for Freedom, as an organization, and two of its officers—have conceded that they have not complied with that requirement. *Id.* at ¶¶ 128-37. For that reason, UB Young Americans for Freedom cannot avail itself of any "[Student Association] club funds, facilities or other resources" under the Acknowledgment Provision and the Legal Status Ban, *id.* at ¶¶ 106-07, 135, provisions that this Court has held are constitutional, *see supra* Section II. Moreover, nothing in the plaintiffs' filings suggest that they are likely to comply with those provisions in the future: On the contrary, they apparently believe that under the Legal Status Ban, to do so would be to sacrifice their independence. *See, e.g.*, Docket Item 37 at ¶ 240. So because the plaintiffs currently are barred from using any of the Student Association's resources, they cannot challenge any Student Association policies on the grounds that those policies confer "unbridled discretion" as to whether any request would be granted.

Stated another way, even if this Court found that the policies at issue indeed confer unbridled discretion, any order it would issue as to those policies still would not allow the plaintiffs to access those resources because the plaintiffs refuse to sign the

form required by the Acknowledgment Provision.  Perhaps that will change after this

decision.  But at least for now, the plaintiffs lack standing to challenge the Student

Association's contract, fundraising, and property policies on their face.[32]

─────────────────────

[32] As UB students, the individual plaintiffs undoubtedly have a "First Amendment interest[]" in the "allocation of" the student activity fee.  *See Southworth I*, 529 U.S. at 233.  In *Southworth I*, the Supreme Court held that the "proper measure, and the principal standard of protection for objecting students, . . . is the requirement of viewpoint neutrality in the allocation of funding support."  *Id.*  But the plaintiffs do not challenge the Student Association's policies regarding the distribution of funding here, nor do they allege any facts suggesting that its decisions under the policies they do challenge would threaten their interest in the viewpoint-neutral distribution of the student activity fee.  *See* Docket Item 37; Docket Item 43 at 28.

This Court nonetheless assumes that any unbridled discretion in the Student Association's Club Recognition Policy—by limiting which groups are eligible to receive funds from the student activity fee—would threaten the viewpoint neutrality of how the funds are distributed and thus might constitute a First Amendment injury to the plaintiffs' interest in the viewpoint-neutral distribution of those funds.  But while the plaintiffs assert in conclusory fashion that "[n]o Student Association policy includes a comprehensive list of objective criteria for recognizing student organizations," Docket Item 37 at ¶ 115, the Club Recognition Policy attached to the second amended complaint indeed provides a detailed list of criteria for a club to be recognized as well as an appeals process for any club denied recognition through that process, Docket Item 37-7; Docket Item 37 at ¶ 110 (identifying this Student Association recognition policy as the current one).  The plaintiffs do not allege that any of these criteria are discriminatory or unreasonable, *see* Docket Item 37, and this Court does not see any reason to find that they are.  On the contrary, the Student Association's by-laws, which also are attached to the second amended complaint, specifically provide that "[a]ll [Student Association] officials, bodies and clubs shall . . . provide access to services, programs, and activities without regard to an individual's . . . political viewpoints," thus barring the Student Association from discriminating based on viewpoint against students who are applying to form a new club.  Docket Item 37-6 at 27.

Courts have found university policies to be viewpoint neutral under similar circumstances.  *See Viewpoint Neutrality Now!*, 516 F. Supp. 3d at 929 (holding that university did "not have unbridled discretion in allocating funds to [registered student organizations]" where policies "include[d] a prohibition on viewpoint discrimination; numerous specific standards for evaluating applications; a set timeline for the application and decision processes; public deliberations and presentations; and a readily available appeals process"); *Southworth II*, 307 F.3d at 587-91 (upholding university funding policy that specifically "prohibit[ed] viewpoint discrimination" and included "detailed procedural requirements" notwithstanding plaintiffs' claim that "some of the criteria [we]re subjective and thus subject to manipulation"); *see also Young*

The plaintiffs also lack standing to challenge those policies as applied.  The second amended complaint does not include any allegation that the plaintiffs' requests under the contract, fundraising, or property policies have been denied in any way that prevents them from exercising their First Amendment rights.  The plaintiffs do allege that the Student Association took almost two months to approve a speaker agreement with Michael Knowles under the contracts policy and that this delay "created substantial logistical difficulties and burdens for planning the event."  *See id.* at ¶¶ 73, 162, 171-72.  But it is undisputed that the event occurred as planned.  *See id.* at ¶ 73.  So the plaintiffs have failed to allege that they suffered any injury in fact as a result of the contracts policy and therefore lack standing to pursue their claim that the policy violates their First Amendment rights as applied.

## **CONCLUSION**

This case boils down to the plaintiffs' refusal to acknowledge compliance with a policy under which they have operated for several years.  There is nothing about that policy—or the required compliance—that precludes the plaintiffs from saying what they want, stops them from associating with any person or entity with whom they want to associate, or compels them to say anything they do not wish to say.  Perhaps the

---

*Am.'s Found. v. Kaler*, 370 F. Supp. 3d 967, 988 (D. Minn. 2019) (upholding university's large-scale events policy and noting that "virtually every recent 'unbridled discretion' challenge to a written university policy or procedure has been rejected, even when the policy uses . . . broad verbiage" (emphasis omitted)), *vacated and remanded as moot*, 14 F.4th 879 (8th Cir. 2021); *cf. Amidon*, 508 F.3d at 101, 105-06 (holding that policy providing that funding decisions were to be made by student referenda—thus imposing a kind of popularity requirement—was unconstitutional and distinguishing the case from *Southworth II*, noting that the court "d[id] not necessarily disagree with that holding, as far as it goes[, b]ut there was no advisory referendum policy at issue in that case").

plaintiffs are correct that if they comply with the policy and acknowledge compliance, the Student Association will try to stop them from speaking or associating in ways that the Student Association does not approve. And if that happens, the plaintiffs may well have a viable constitutional challenge. But that is a case for another day.

For the reasons stated above, the defendants' motions to dismiss for lack of subject matter jurisdiction and failure to state a claim are GRANTED; the plaintiffs' motion for a preliminary injunction is DENIED; and the Clerk of the Court shall close this case.

SO ORDERED.

Dated:  December 15, 2024
        Buffalo, New York


                                        /s/ Lawrence J. Vilardo
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE